447 F.2d 786
 1971 Trade Cases P 73,636
 YORK CHRYSLER-PLYMOUTH, INC., a corporation, C. C. York and
Jerry A. York, Plaintiffs-Appellees-Cross Appellants,
v.
CHRYSLER CREDIT CORPORATION, a corporation, Defendant,
Chrysler Motors Corporation, a corporation, and Chrysler
Corporation, a corporation, Defendants-Appellants-Cross
Appellees, and Chrysler Credit Corporation, a Delaware
Corporation, Intervenor-Appellant-Cross Appellee.
 No. 29980.
 United States Court of Appeals, Fifth Circuit.
 July 20, 1971.
 
 C. B. Arendall, Jr., Edmond R. Cannon, Jr., W. Ramsey McKinney, Jr., Mobile, Ala., Walter B. Maher, Detroit, Mich., for defendants-appellants cross-appellees.
 Sam W. Pipes, Norton W. Brooker, Jr., Mobile, Ala., for intervenor-appellant cross-appellee Chrysler Credit Corp., a Del. Corp., Lyons, Pipes & Cook, Mobile, Ala., of counsel. R. F. Adams, Brock B. Gordon, Mobile, Ala., for plaintiffs-appellees-cross-appellants; Johnstone, Adams, May, Howard & Hill, Mobile, Ala., of counsel.
 Before CLARK, Associate Justice,* GEWIN and RONEY, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 York Chrysler-Plymouth, Inc., C. C. York and Jerry A. York brought suit against Chrysler Corporation, Chrysler Motors Corporation and Chrysler Credit Corporation of Michigan on two counts of fraud and deceit, violation of the antitrust laws and violation of the Automobile Dealers Day in Court Act, 15 U.S.C. 1221-1225. Chrysler Credit Corporation (Delaware) intervened and filed a claim against the plaintiffs for money due on a loan.[1]
 
 
 2
 There was a jury verdict in favor of the defendants on three of the causes of action, but the jury returned a verdict in favor of the plaintiffs against Chrysler Corporation and Chrysler Motors Corporation for $107,000.00 on the action under the Dealers Day in Court Act. We affirm this judgment as to Chrysler Motors, but reverse and remand as to Chrysler Corporation.
 
 
 3
 The intervenor, Chrysler Credit Corporation (Delaware) obtained a verdict for $49,000.00 against C. C. York and Jurry A. York. Chrysler Credit seeks to have York Chrysler-Plymouth, Inc., added to the judgment and the Yorks seek to have the judgment set aside. We affirm.[2]
 
 
 4
 This case had its genesis in 1963, when C. C. York and his son, Jerry A. York, purchased 100% Of the stock of Barnes Motors, Inc., a Chrysler-Plymouth dealership located in the downtown section of Mobile, Alabama. The purchase price was $75,000.00, of which $70,000 was borrowed from Commercial Credit Corporation and the remaining $5,000 was provided by Jerry A. York. C. C. York, who served as president of the dealership corporation, took title to two-thirds of the capital stock. Jerry A. York, who served as vice-president, owned the other third.
 
 
 5
 In 1964, a representative of Chrysler Motors Corporation approached the Yorks with the proposition that they move their business from its downtown location to the new 'automobile row' being developed on the outskirts of Mobile. The Yorks agreed to this suggestion, and on October 21, 1964, they entered into a Dealer Relocation Agreement with Chrysler Motors. This agreement contemplated that Chrysler Motors would buy land and construct a new facility which would then be leased to the dealership corporation.
 
 
 6
 There were two other significant occurrences in 1964. First, the Yorks became short of working capital and had to obtain from Commercial Credit Corporation a three month moratorium on the $70,000 loan which had been taken out in connection with purchase of the dealership. Second, Chrysler Motors Corporation performed a 'Dealership Survey,' which pointed out that the cash flow position of the dealership was precarious. The survey recommended, among other things, that the capital loan with Commercial Credit be renegotiated. The Yorks declined, however, to take this step.
 
 
 7
 Chrysler Motors then suggested that the Yorks might obtain needed working capital by reorganizing the dealership under the 'Dealer Enterprise Plan.' In general terms, the Dealer Enterprise Plan works this way. Chrysler Motors Corporation provides as much as 75% Of the dealership's required capital, taking preferred stock in the dealership corporation in exchange. The dealer contributes a minimum of 25% Of the capital, taking common stock in exchange. The preferred stock is retired gradually, out of the profits of the business, so that the individual dealer eventually becomes sole owner of the business. Until the preferred stock is retired, however, Chrysler Motors controls the dealership's board of directors.
 
 
 8
 The Yorks initially expressed an interest in the Dealer Enterprise Plan (D.E.) and, in fact, submitted a D.E. application in December of 1964. By the time the application had been approved, however, they had become concerned over the fact that under the D.E. Plan they would have to give up control of the dealership, so they advised Chrysler that they were no longer interested in a Dealer Enterprise operation.
 
 
 9
 In the fall of 1965, the Yorks accomplished the relocation of their dealership. In conjunction with the move, a number of changes were made. The dealership's name was changed from Barnes Motors to York Chrysler-Plymouth, Inc. The Yorks also changed their financing, severing their relationship with Commercial Credit Corporation and placing their retail and wholesale financing with Chrysler Credit Corporation. In addition, Chrysler Credit made the dealership a $40,000 capital loan, which was used to pay off the balance of the outstanding loan with Commercial Credit and an outstanding bank loan.
 
 
 10
 Since the name and location of the dealership had changed, it was necessary for the Yorks to enter into a new franchise agreement with Chrysler Motors. Chrysler Motors was dissatisfied with the financial condition of the dealership, however, and refused to give the Yorks the same 'Direct Dealer Agreement' under which they had previously operated. Instead the parties entered into a 'Term Sales Agreement,' which differed from the Direct Dealer Agreement in two respects.[3] First, it ran for only a one year term. Second, it obligated the Yorks to increase their working capital. At the time the agreement was signed, however, Chrysler Motors informed the Yorks orally that it would not hold them to the strict requirements of the agreement, but would be satisfied with a good faith effort at increasing the working capital.
 
 
 11
 In January, 1967, Chrysler Credit performed an audit of the dealership's books in connection with renewal of the $40,000 capital loan. According to this audit, (the accuracy of which is not admitted by plaintiffs) the dealership's net worth was a deficit of $2,000 and its working capital was a deficit of some $34,000. Chrysler Credit then performed a physical inventory of the automobiles in possession of the dealership and discovered that 22 new and used cars had been 'sold out of trust.'[4] The value of the cars sold out of trust amounted to slightly over $50,000.
 
 
 12
 On Monday, January 23, 1967, following the audit and discovery of the out of trust condition, representatives of Chrysler Motors Corporation met at the offices of York Chrysler-Plymouth with the regional manager of Chrysler Credit to discuss the future of the York dealership. The Yorks did not participate is this meeting, but were told that Chrysler Motors Corporation was trying to 'work something out.' The following day Chrysler Credit asked the Yorks to surrender the assets of the dealership corporation, in accordance with the security agreements held by Chrysler Credit. That evening, after the necessary papers had been reviewed by the Yorks' attorney, Chrysler Credit took over the assets of the dealership corporation. At the same time Chrylser Motors Corporation asked the Yorks to sign a mutual termination of the franchise. On advice of their attorney, they refused. Wednesday Chrysler Motors again asked the Yorks to resign from the dealership and the Yorks again refused.
 
 
 13
 This action was instituted on February 16, 1967. The Term Sales Agreement was allowed to expire by its own terms two months later.
 
 
 14
 I. Chryslers' Appeal of the $107,000 Judgment.
 
 
 15
 A. C. C. York and Jerry A. York as Parties Plaintiff.
 
 
 16
 Although not signing parties to the franchise agreement, C. C. York and Jurry A. York were so inextricably woven into it that we believe they could assert a claim against Chrysler Motors under the Dealers Day in Court Act. Section 1221(c) defines a dealer as any person or corporation 'operating under the terms of a franchise.' The individuals would not come within the scope of the Act merely because they were sole stockholders, officers and directors of the corporate franchise holder. Schaffer v. Universal Rundel Corp., 397 F.2d 893 (5th Cir. 1968); Martens v. Barrett, 245 F.2d 844 (5th Cir. 1957). However, following the reasoning in Kavanaugh v. Ford Motor Company, 353 F.2d 710 (7th Cir. 1965), we believe that the Yorks were made essential to operation of the dealership by the agreement with Chrysler Motors. The Direct Dealer Agreement held by the Yorks at the old location recited that Chrysler Motors Corporation 'has entered into this agreement relying on the active, substantial and continuing personal participation' of C. C. York and Jerry A. York, required them to maintain beneficial ownership and control of the stock in the dealership corporation, could be terminated if either of them died or failed to continue in the active management of the dealership or was convicted of certain crimes, and could even be terminated if Chrysler Motors thought that a disagreement between them might adversely affect the business.
 
 
 17
 Having thus visited upon the Yorks the personal responsibility for keeping the franchise viable, Chrysler Motors cannot now successfully maintain that they should be denied the benefits provided to dealers by the Dealers Day in Court Act. The trial court properly denied all moves to dismiss the individual Yorks as parties plaintiff.
 
 
 18
 B. Chrysler Corporation as Defendant.
 
 
 19
 The $107,000 judgment was entered against Chrysler Corporation and Chrysler Motors Corporation. Chrysler Corporation manufactures the automobiles but sells them only to Chrysler Motors corporation, its wholly-owned sales subsidiary. Chrysler Motors has sole responsibility for distribution and marketing of Chrysler products, and it is this corporation alone which enters into franchise contracts with automobile dealerships.
 
 
 20
 Clearly both Chrysler Corporation and Chrysler Motors are automobile manufacturers as defined in the Act. Chrysler Motors is such because it is a 'corporation which acts for and is under the control of such manufacturer or assembler (Chrysler Corporation) in connection with the distribution of said automotive vehicles.' 15 U.S.C. 1221(a). Either could be sued for failure 'to act in good faith in performing or complying with any of the terms or provisions of the franchise.' 15 U.S.C. 1222. However, there being no showing that would make either responsible for the acts of the other on an agency theory, and the facts indicating that they are separate legal entities each operating in its own sphere, only the one which has entered into a franchise agreement could be held accountable for performing or complying with it. Since Chrysler Corporation was not a party to the franchise and had no legal responsibility to plaintiffs for the acts of Chrysler Motors, which signed the franchise, it should have been dismissed from the suit and the judgment should not have been entered against it. R.A.C. Motors, Inc. v. World-Wide Volkswagen Corp., 314 F.Supp. 681 (D.N.J. 1970); Reliable Volkswagen Sales & Service Co. v. World-Wide Auto Corp., 216 F.Supp. 141 (D.N.J.4963); Cf., Southern Rambler Sales, inc. v. American Motors Corp., 375 F.2d 932 (5th Cir. 1967), cert. den. 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92.
 
 
 21
 C. Legal Right to Terminate.
 
 
 22
 The fact that Chrysler Motors may have had grounds for lawful termination of the automobile dealership does not permit this court to set aside a jury verdict after a trial which provided ample opportunity for this defense to be asserted. Frank Chevrolet Co. v. General Motors Corp., 419 F.2d 1054 (6th Cir. 1969) does not hold otherwise. There the court affirmed a summary judgment which merely held that the sales performances of the dealer in that case consistently fell below acceptable standards in violation of the agreement between the parties and that the refusal to renew the contract did not constitute an act of bad faith under the statute.
 
 
 23
 The Dealers Day in Court Act contemplates a cause of action even upon the assertion of legal rights if there is a failure of good faith in the exercise thereof. Assuming issues of fact which would support a finding of lack of 'good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise,' it is up to the jury to determine the redemption value of the facts indicating that the action could have been taken in good faith. The Act specifically permits the assertion of the dealer's failure to act in good faith as a defense. 15 U.S.C. 1222. The Act is not as concerned with what the parties did as it is concerned with why they did it.
 
 
 24
 We hold that to the extent that this issue was presented, the jury must have resolved it against Chrysler, and to any extent that it was not presented below, we cannot consider it on appeal. Hanley v. Chrysler Motors,433 F.2d 708 (10th Cir. 1970); Pan-American Life Ins. Co. v. Alvarez, 374 F.2d 92 (5th Cir. 1967), cert, den., 389 U.S. 829, 88 S.Ct. 89, 19 L.Ed.2d 85.
 
 
 25
 D. Sufficiency of the Evidence.
 
 
 26
 Chrysler Motors finally urges that there was insufficient evidence to support the jury's verdict of a violation of the Dealers Act. Although not necessarily compelling, the evidence provides a sufficient basis for the jury's decision, as viewed most favorably to the plaintiffs. Boeing Co. v. Shipman,411 F.2d 365 (5th Cir. 1969).
 
 
 27
 The pivotal question that the jury had to determine concerned the alleged failure of the defendant to exercise 'good faith' in its dealings with the plaintiffs and the coercive or intimidating effect of such dealings upon them. By its very nature, this determination must be made on inferences drawn from the evidence. It is derived from a subjective analysis of the facts. Reasonable men might differ. Thus, the jury verdict must stand.
 
 
 28
 Section 1221(e) of the Act defines the 'good faith' against which defendants' acts were to be considered.
 
 
 29
 '(e) The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.'
 
 
 30
 The broad theory which the Yorks presented at trial was that Chrysler Motors wanted a high volume Chrysler-Plymouth dealership in the Mobile area without regard to the advantage or disadvantage to the dealer.[5] The most expeditious method of obtaining such a goal was to establish a Dealer Enterprise operation in which Chrysler moved into a position of control. When the Yorks refused to go along with this plan, Chrysler Motors and Chrysler Credit Corporation[6] strung together a series of acts which were designed to coerce and intimidate the Yorks into bending to Chrysler's desires or suffering a termination of their franchise. They contended that this is the kind of evil in the manufacturer-dealer power struggle that the Act was designed to cover.[7]
 
 
 31
 That certain specific conduct has been held not to constitute a violation of the Act in certain cases does not lead to the conclusion that such conduct would not violate the Act in the setting of another case.[8] The actions of the manufacturer must be considered under the circumstances arising in each particular case. The entire course of dealing between manufacturer and dealer may be considered and it may then be concluded by the jury that the total conduct was violative of the Act.[9] American Motors Sales Corp. v. Semke, 384 F.2d 192 (10th Cir. 1967).
 
 
 32
 II. The $49,000 Judgment.
 
 
 33
 A. Chrysler Credit's Motion to Add York Chrysler-Plymouth, inc. to $49,000 Judgment.
 
 
 34
 Chrysler Credit's claim was asserted against York Chrysler-Plymouth, Inc., C. C. York and Anyce York, his wife, and Jerry A. York and Mary V. York, his wife. The jury returned a verdict against only C. C. York and Jerry A. York. It did this by using a form verdict, prepared by the court, which listed the names of C. C. York and Jerry A. York and their two wives. The jury struck out the names of the wives and did not write in the name of York Chrysler-Plymouth, Inc.
 
 
 35
 Chrysler Credit moved to amend or correct the judgment by adding York Chrysler-Plymouth. The court denied the motion. Chrysler Credit claims an abuse of discretion on two grounds. First, an affidavit of the foreman of the jury says that the jury intended the verdict to be against the dealership corporation as well as against the Yorks. Second, Chrysler argues that it is not logical that the jury intended to return a verdict against the guarantors, C. C. York and Jerry A. York, and not against the principal debtor, York Chrysler-Plymouth.
 
 
 36
 As to the first argument, we see no reason not to apply the well-established rule that a single juror cannot be heard to impeach the verdict of the whole jury. McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); Complete Auto Transit, Inc. v. Wayne Broyles Eng. Corp., 351 F.2d 478 (5th Cir. 1965); compare Fox v. United States, 417 F.2d 84 (5th Cir. 1969).
 
 
 37
 As to the second argument, there is no rule of law that requires a jury's actions to be logical. It might seem just as illogical for the jury to strike the York wives from the judgment, when their liability was legally the same as their husbands'. But this it was free to do.
 
 
 38
 The trial judge did not abuse his discretion in refusing to amend the judgment to include York Chrysler. Wagner v. Pennsylvania R.R. Co., 282 F.2d 392 (3rd Cir. 1960); cf. United States v. Gould, 301 F.2d 353 (5th Cir. 1962).
 
 
 39
 B. York's Appeal from $49,000 Judgment Against Them in Favor of Chrysler Credit Corporation.
 
 
 40
 Chrysler Credit Corporation obtained the $49,000 jury verdict against C. C. York and Jerry York individually on the basis of their guarantee of the debt of their dealership corporation. The Yorks seek to have the resulting judgment set aside on any one of four grounds: (1) insufficiency of the evidence, (2) accord and satisfaction, (3) release as sureties on the corporate indebtedness when the corporate debt was extinguished and (4) failure of Chrysler Credit to reserve its rights against the Yorks individually at the time it released the dealership corporation.
 
 
 41
 (1) Insufficiency of the Evidence.
 
 
 42
 There was sufficient evidence to show that the total debt due from York Chrysler-Plymouth, Inc. to Chrysler Credit Corporation, guaranteed by C. C. York and Jerry A. York individually, was $493,664.75. The total amount realized from the sale and disposition of the assets, including the automobiles delivered under the agreement, was $432,585.53. The difference exceeds the $49,000 jury verdict in favor of Chrysler Credit. The record is replete with testimony of how the total debt was computed and the various items that made up such total. The Yorks argue a different method of computation that would reduce this debt, but the matter was settled by the jury verdict.
 
 
 43
 Inasmuch as no motion was made for a directed verdict, we would not normally review the sufficiency of the evidence. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5th Cir. 1967), cert. den., 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652; DuPont v. Southern Pacific Co., 366 F.2d 193 (5th Cir. 1966); Stockton v. Altman, 432 F.2d 946 (5th Cir. 1960). In order to circumvent this rule, plaintiffs moved to amend the jury's award from $49,000.00 to $0.00. Although such relief might be appropriate where there is absolutely no evidence to support the verdict, such is clearly not the case here. See, Mumma v. Reading Co., 247 F.Supp. 252 (E.D.Pa.1965).
 
 
 44
 (2) Accord and Satisfaction.
 
 
 45
 On January 24, 1967, Chrysler Credit received automobiles and other assets from York Chrysler under an agreement which provides essentially as follows:
 
 
 46
 '(Chrysler Credit) does hereby agree that on and after the execution and fulfillment of the terms of this agreement, (York Chrysler) shall be relieved of all liability on all of the automobiles, both new and used, delivered to (Chrysler Credit) by (York Chrysler) and covered by trust receipts and other security agreements, as well as all other physical assets voluntarily surrendered to (Chrysler Credit) by (York Chrysler) under the terms of this agreement.'
 
 
 47
 The parties cannot agree on the interpretation of this agreement.
 
 
 48
 In the first place, the Yorks claim that the assets were surrendered and accepted in payment of an unliquidated claim and that an accord and satisfaction took place which, as a matter of law, extinguished the entire claim. Hand Lumber Co. v. Hall, 147 Ala. 561, 41 So. 78 (1906).[10]
 
 
 49
 The difficulty with this argument is simply that the agreement by its terms is limited to automobiles and assets delivered to and surrendered to Chrysler Credit. There were 17 new and 5 used cars, valued at $50,054.98, which had been sold out of trust and for which Chrysler Credit had not been paid.
 
 
 50
 Under the principle of expressio unius est exclusio alterius the inclusion in the agreement of automobiles delivered to Chrysler Credit necessarily excluded from the operation of the agreement the release from liability on automobiles not delivered. Southern Coast Corporation v. Sinclair Refining Co., 181 F.2d 960 (5th Cir. 1950); Pennsylvania Railroad v. Chesapeake and Ohio Railroad, 229 F.2d 721 (6th Cir. 1956).
 
 
 51
 (3) Release.
 
 
 52
 In the second place, the Yorks take the position that the agreement acted as a release of the principal debtor and that being sureties they are likewise released. Knighton v. Curry, 62 Ala. 404 (1878); State v. Parker,72 Ala. 181 (1882); McBroom v. Governor, 6 Port. 32 (1837).
 
 
 53
 This argument is foreclosed by the fact that the agreement did not act as a release of liability for the automobiles sold out of trust.
 
 
 54
 The Yorks further argue that when the jury failed to return a verdict against York Chrysler-Plymouth, Inc., it found that the principal debtor had been released and that the sureties were thus released as a matter of law. However, the guarantee agreement specifically provided that a release of York Chrysler would not affect the obligation of the individual Yorks.[11] Such agreements are enforceable under Alabama law. Shows v. Steiner, Lobman & Frank, 175 Ala. 363, 57 So. 700 (1911).
 
 
 55
 This also answers the argument that Chrysler Credit failed to reserve its rights against the individuals with sufficient specificity. According to the terms of the agreements, no such reservation was necessary.
 
 
 56
 III. Disposition.
 
 
 57
 We have carefully reviewed every other argument as to error in the court below. That portion of the judgment of the district court which relates to the defendant Chrysler Corporation is reversed, and the cause is remanded to the district court for entry of an order dismissing the complaint against that defendant. In all other respects the judgment of the district court is affirmed.
 
 
 58
 Reversed and remanded in part; affirmed in part.
 
 
 
 *
 Hon. Tom C. Clark, Associate Justice United States Supreme Court (Ret.), sitting by designation
 
 
 [1]
 The confusing circumstance that Chrysler Credit Corporation appears both as a party defendant and as an intervenor is accounted for by the fact that during the period pertinent to this suit there were two corporations bearing the name of Chrysler Credit Corporation. One was an Alabama corporation, the other was a Delaware corporation. Plaintiffs did business with the Alabama corporation, but service of process was effected only on the Delaware corporation. After suit was filed, the Delaware corporation merged with a Michigan corporation. The Alabama corporation was then merged into a new Delaware corporation bearing the same name, 'Chrysler Credit Corporation.' It was the new Delaware corporation, successor to the Alabama corporation, which intervened here
 
 
 [2]
 The Yorks seek a new trial on their third and fourth causes of action in the event of a reversal. Our disposition of this case makes it unnecessary to consider these matters
 
 
 [3]
 This agreement was not signed until April, 1966. Until that time the York dealership simply operated without any formal franchise
 
 
 [4]
 'Sold out of trust' or 'SOT' are terms used in automobile floor-plan financing to refer to the condition which exists when an automobile dealer has sold automobiles and failed to pay its liability with respect thereto to the financing institution, in this case, Chrysler Credit
 
 
 [5]
 The case of Madsen v. Chrysler Corporation, 261 F.Supp. 488 (N.D.Ill.1966) vacated for mootness, 375 F.2d 773 (7th Cir. 1967) with similar facts sets forth the following analysis of Chrysler's D. E. Program
 'By giving the dealer the use of Chrysler's funds (in whole or in part) and by restricting his obligation to purchase any of the manufacturer's interest to only those situations where the dealership has shown a profit for the year, the DE system effects a substantial reduction in the risks which the dealer takes. As a result, the dealer's primary concern becomes synonymous with that of the manufacturer: selling more cars. He is under less pressure to sell each car at a satisfactory profit. The record shows that DE dealerships have often operated at an overall loss for substantial periods of time and, when profitable, their profit per new car sold is substantially lower than that of private dealers. The DE outlet is also equipped to handle a large volume of service, thus adding an additional factor enabling the dealer to forego profit in the sale of new cars. In short, the DE dealerships are designed to obtain volume and to increase the manufacturer's share of the market beyond that which even an aggressive private dealer can obtain.' 261 F.Supp. at 499.
 Also see: Swartz v. Chrysler Motors Corporation, 297 F.Supp. 834 (C.D.N.J.1969); Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa.1968); aff'd, 417 F.2d 622 (3rd Cir. 1969).
 
 
 [6]
 Although not a party defendant, Chrysler Credit Corporation was a related company to Chrysler Motors and we think that its actions could be properly considered by the jury in determining the good faith of Chrysler Motors
 
 
 [7]
 The legislative history of the Dealer Act states that 'The existence of coercion or intimidation depends upon the circumstances arising in each particular case and may be inferred from a course of conduct.' United States Code, Congressional and Administrative News, (1956) 84th Congress, Second Session, Vol. 3, p. 4603. In further explanation of the remedial intent of the Act to correct 'the manifest disparity in the ability of franchised dealers * * * to bargain with their manufacturers' (p. 4597) the Committee of the House explained as follows:
 'Manufacturer coercion or intimidation or threats thereof is actionable by the dealer where it relates to performing or complying with any of the terms or provisions of the franchise, or where it relates to the termination, cancellation, or nonrenewal of the dealer's franchise. Thus, where a dealer's resistance to manufacturer pressure is related to cancellation or nonrenewal of his franchise a cause of action would arise.' At p. 4603.
 
 
 [8]
 In other cases, it has been held that there was no violation of the Act in (1) requiring the dealer to submit monthly financial statements, Garvin v. American Motors Corp., 318 F.2d 518 (3rd Cir. 1963); (2) requiring the dealer to maintain satisfactory and competitive business facilities, Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir. 1962), cert. den., 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962); (3) requiring the dealer to meet reasonable minimum sales responsibilities, Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., 357 F.2d 429 (5th Cir. 1966); (4) requiring the dealer to provide working capital in accordance with reasonable standards set by the manufacturer, Globe Motors Inc. v. Studebaker-Packard Corp., 328 F.2d 645 (3rd Cir. 1964); (5) insisting that a dealer sell more cars, advertise in a certain way and hire more salesmen, Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., supra; (6) urging a dealer to adopt better business practices and insisting that he devote full time to his business, Kotula v. Ford Motor Co., 338 F.2d 732 (8th Cir. 1964), cert. den., 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); (7) threatening to assert contract rights, Fabert Motors v. Ford Motor Company, 355 F.2d 888 (7th Cir. 1966); (8) establishing competitive dealerships, Southern Rambler Sales v. American Motors Corp., supra; (9) soliciting the dealer's agreement to a mutual termination of the franchise, Victory-Motors, supra; Kotula, supra; (10) demanding relocation to better facilities, Unionvale Sales, Ltd. v. World-Wide Volkswagen Corp., 299 F.Supp. 1365 (S.D.N.Y.1969); (11) engaging in arbitrary conduct, Berry Bros. Buick v. General Motors Corp., 257 F.Supp. 542, aff'd, 377 F.2d 552 (3rd Cir. 1967); (12) cancelling a franchise because of an unauthorized transfer of ownership, General Motors Corp. v. Mac Co., 247 F.Supp. 723 (D.Colo. 1965)
 
 
 [9]
 The Yorks argued that the following activity was sufficient basis for the jury to find lack of good faith and coercion: (1) Chrysler told the Yorks that if they didn't move out to automobile row, Chrysler would put another dealer there. (2) Chrysler had already decided to put a D.E. dealer in the new facility. (3) In order to make the Yorks move, Chrysler promised (a) no change in working capital would be required, (b) a new dealer agreement would be issued, as a mere formality, (c) the Yorks would have an exclusive dealership in Mobile, (d) the Yorks would receive financial assistance in making the move. (4) In the summer of 1964 Chrysler was aware of the Yorks' short working capital position. (5) In the spring of 1965 Chrysler 'exerted pressure' on the Yorks to increase working capital and sales volume. (6) Even after the Yorks withdrew their D.E. application, Chrysler kept 'offering' them that 'opportunity.' (7) After September, 1965, when the relocation took place, there 'was no turning beck' for the Yorks, because if they didn't get a new franchise agreement within 30 days, the termination of their old franchise remained effective. (8) At trial Mr. Smith, of Chrysler Motors, stated he didn't know that Chrysler Credit was financing the Yorks. The Yorks argued that this was untrue. (9) In January, 1966, the Yorks were told that they would have to go D.E., borrow additional capital, or take a Term Sales Agreement. (10) The Yorks did not receive the relocation money which Chrysler had promised them until they agreed to sign the Term Sales Agreement. (11) In the summer of 1966 the Yorks' Minimum Sales Requirement %(Msr)/ was raised 17%. In order to get the cars they wanted, the Yorks had to take the cars which the regional sales manager forced upon them. (12) Chrysler had actual knowledge that the Yorks had not increased their working capital, despite what was on the monthly financial reports. (13) Chrysler Motors and Credit contributed to the Yorks' shortage of cash by offsetting parts account with rebate moneys which were given to Credit. (14) In September, 1966, Credit froze 50% Of the dealer reserve account, which contributed to shortage of capital. (15) Chrysler owed the dealership $23,000 in holdback and warranty moneys. The Yorks claimed that if they had had this money, they wouldn't have run out of working capital. (16) Neither Chrysler nor Credit met with the Yorks to explore ways out of the SOT condition. (17) Until presented with the turn-over agreement, the Yorks had been led to believe that Chrysler would work something out. (18) Chrysler falsely promised that the Yorks' employees could keep their jobs after the turn-over agreement was signed. (19) It was contemplated that the dealership would be taken over by John Gimma, the very person with whom C. C. York had been trying to negotiate a sale
 
 
 [10]
 'The rule that the payment of a less sum than the real debt will be no satisfaction of a larger sum without a release by deed applies only to conceded or undisputed demands. Where the claims are in dispute the compromise and part payment thereof are sufficient consideration to support the discharge. * * * When a claim is unliquidated or in dispute, payment and acceptance of a less sum than claimed in satisfaction operates as a accord and satisfaction, * * *. The fact that the creditor was not legally bound to make any abatement of his claim, or that the amount accepted was much less than the creditor was entitled to receive and would have recovered, had he brought action, does not in any way affect the rule.' At p. 79
 
 
 [11]
 'You (Chrysler Credit) may, without notice to us, renew, extend, or transfer any obligations of Borrower (York Chrysler) or of its customers or of other guarantors; accept partial payments thereon, or settle, release on terms satisfactory to you or by operation of law or otherwise, compound, compromise, collect, or otherwise liquidate any obligation or security therefor in any manner; consent to the transfer of such security and bid and purchase at any sale without affecting or impairing the obligation of any of us hereunder.'