Martin L. MOOREHEAD

v.

GENERAL MOTORS CORPORATION, William G. Rohrer, Alan J. Kirsch and Samuel Marino.

Civ. A. No. 75–3595.

United States District Court, E. D. Pennsylvania.

Dec. 30, 1977.

Edwin B. Barnett, Philadelphia, Pa., for plaintiff.

W. Bradley Ward, Philadelphia, Pa., for General Motors Corp.

Pat Charles, Collingswood, N. J., for William G. Rohrer.

OPINION

LUONGO, District Judge.

Martin L. Moorehead brought this action for damages against General Motors Corporation and against William G. Rohrer, Alan J. Kirsch, and Samuel J. Marino. The complaint states four causes of action, all based on the circumstances surrounding General Motors' termination of a franchised Chevrolet dealership, Moorehead & Sons Chevrolet, Inc. Plaintiff asserts general federal question jurisdiction, 28 U.S.C. § 1331(a) (1970), for the first cause of action, and pendent jurisdiction for the remaining three causes of action.

The first cause of action, based on the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–25 (1970), alleges that General Motors Corporation (hereinafter GMC) is liable under the Act for acting "in bad faith toward both plaintiff and Moorehead, Inc. [the dealership] (a) in refusing to permit Moorehead, Inc. to renew its franchise; (b) in terminating the franchise of Moorehead, Inc.; and (c) in refusing to permit the plaintiff or Moorehead, Inc. to make contractual arrangements with a successor franchisee." Complaint ¶ 23. None of the individual defendants are named in this cause of action. The plaintiff's second cause of action, however, alleges a conspiracy among GMC and defendants Rohrer, Kirsch, and Marino to render the Moorehead, Inc. franchise worthless, to deprive Moorehead of his employment as an officer and "dealer operator" of Moorehead, Inc., and to drive Moorehead out of the automobile business.

Under the the third cause of action, Rohrer, Kirsch, and Marino allegedly conspired to cause Moorehead, Inc. to lose its franchise by effecting a transfer of the majority

stock interest in Moorehead, Inc. without notifying GMC or securing its approval, as required by the franchise agreement. The complaint also states that, "in the alternative," GMC itself was a party to this conspiracy. Complaint ¶ 30. The plaintiff's contention here is that GMC knew of the contemplated stock transfer, but remained silent so as to have "an apparent legalistic basis for terminating Moorehead, Inc.'s franchise." *Id.*

The fourth cause of action alleges that Kirsch and Marino, "on their own or in conspiracy with GMC," caused GMC to disapprove Preston Mintz, Moorehead's proposed successor to the franchise, thereby depriving Moorehead of the opportunity to sell the franchise to his successor. Complaint ¶ 34. Defendant Rohrer is not named in this cause of action.

■ This case is now before me on separate motions by GMC and Rohrer for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) provides in pertinent part:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"The law is clear that one who moves for a summary judgment has the burden of demonstrating that there is no genuine issue of fact." *Fairbanks, Morse & Co. v. Consolidated Fisheries Co.,* 190 F.2d 817, 824 (3d Cir. 1951), *quoted with approval in Ettinger v. Johnson,* 556 F.2d 692, 696 (3d Cir. 1977). For purposes of a summary judgment motion, a court must view the evidence in the light most favorable to the party opposing the motion. *Bishop v. Wood,* 426 U.S. 341, 347 n. 11, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Thus, if the

party opposing the motion alleges facts in his complaint that are supported by affidavits or other evidence, those facts must be taken as true in ruling on the motion. *First Nat'l Bank of Cincinnati v. Pepper,* 454 F.2d 626, 629 (2d Cir. 1972). The opposing party may not, however, rest on the allegations contained in his complaint. Federal Rule 56(e) provides in pertinent part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

See *Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976); *Williams v. McAllister Bros., Inc.,* 534 F.2d 19, 23–24 (2d Cir. 1976); *Season-All Indus., Inc. v. Merchant Shippers,* 417 F.Supp. 998, 1002 (W.D.Pa.1976).

The factual record in this case consists of the initial pleadings, the depositions taken of the following parties, and the 90 exhibits identified in connection with the depositions: Martin Moorehead (201 pp.), William G. Rohrer (91 pp.), Alan J. Kirsch (106 pp.), Samuel J. Marino (99 pp.), Edward G. McLeod, Assistant Zone Manager for Chevrolet (93 pp.), Rudolph H. Schmittdiel, Jr., Zone Manager for Chevrolet (87 pp.), Joseph Rooney, successor to Mr. Schmittdiel as Zone Manager (13 pp.), Seville S. Funk, Zone Business Manager for Chevrolet (35 pp.), and Preston Mintz (52 pp.). In addition, GMC's motion for summary judgment is supported by affidavits from Mr. Schmittdiel and Mr. McLeod, from John P. Eckenrode, a former Assistant Zone Manager for Chevrolet in the Zone where Moorehead, Inc. operated, and from John P. Meighan, a former District Manager in the District where Moorehead, Inc. operated. Plaintiff has filed a brief in opposition to

GMC's motion, and it contains half a dozen citations to various exhibits and to statements made during depositions. The plaintiff has submitted no affidavits in support of his opposition to GMC's motion and he has offered no explanation for the absence of supporting affidavits.[1]

Following oral argument, I deferred ruling on GMC's motion in order to allow the plaintiff to take the deposition of Preston Mintz. I have considered carefully the Mintz deposition, as well as the parties' supplemental briefs in connection therewith. They have little bearing upon what I view as the controlling issue in this case.

The facts of this case, viewed in the light most favorable to Moorehead, are as follows: On October 10, 1966, Moorehead and defendant Rohrer entered into a written agreement for the formation of Moorehead & Sons Chevrolet, Inc. Rohrer put up $65,-000, acquired real estate in New Hope, Pennsylvania, and built a new building thereon to lease to the dealership. In return, Rohrer took a 63.9% interest in the dealership's capital stock. The agreement provided that for five years Moorehead was to have the right of first refusal before Rohrer could sell any of the stock to a third party. Plaintiff's Ex. 2, ¶¶ 6–7. In addition, Moorehead was President of the corporation and held all its remaining stock.

Moorehead, Inc. was formed in November 1966, and on December 1 of that year it entered into a five-year Dealer Selling Agreement with GMC. GMC Ex. 8. The Agreement was signed by Moorehead as President of Moorehead, Inc. Although the Agreement named Moorehead, Inc., and not Moorehead himself, as the dealer, it also provided:

"THIRD: This Agreement is a personal service contract, and is entered into by Chevrolet with Dealer in reliance upon and in consideration of the personal qualifications, and the representations made to Chevrolet with respect thereto, of the following named person or persons who, it is agreed, will substantially participate in the ownership of Dealer and/or will actively participate in the operation of Dealer's Chevrolet dealership."

Immediately following the above provision, the parties indicated by checking the appropriate boxes that Moorehead was to participate in both the ownership and the operation of the dealership. No one other than Moorehead was named in this provision.

On November 1, 1970, GMC and Moorehead, Inc. executed a five-year Chevrolet Car and Standard Truck Dealers Sales and Service Agreement. GMC Ex. 36. The agreement was again signed by Moorehead as President of Moorehead, Inc. This agreement also named Moorehead, Inc., rather than Moorehead, as the dealer, and it, too, contained a provision similar to the one quoted above. This provision differed in only two material respects. First, the person named thereafter who was denominated the Owner was required to substantially participate, both of record and beneficially, in the ownership of Dealer. Second, the person named thereafter who was denominated the Operator was required to "actively manage" the dealership. Immediately following this provision, the parties indicated by entries in the appropriate columns that Martin Moorehead was to be both Owner and Operator. As was the case with the earlier agreement, no one else was named in this provision. Id. ¶ 3.

A document was executed, dated October 8, 1971, purporting to extend the five-year Moorehead-Rohrer agreement as to Moorehead's right of first refusal. Ex. "A" to Plaintiff's Complaint. The only copy of this document that was produced is unsigned, and the record is unclear as to whether the parties ever signed the agreement. Deposition of Martin L. Moorehead (hereinafter MLM) 67–69.

1. Rule 56(f) of the Federal Rules of Civil Procedure provides:

"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

On September 11, 1973, Moorehead sold his entire stock interest to Kirsch and Marino. As part of the same transaction, Moorehead resigned as President and director of Moorehead, Inc., and entered into a five-year employment contract with Moorehead, Inc. under which he was named General Manager of the dealership. Moorehead intentionally did not inform GMC of this transaction, because he knew that it amounted to ground for termination of the franchise held by Moorehead, Inc. MLM 154, 180, 184, 187. Neither Kirsch nor Marino informed GMC of the transaction.

On December 27, 1973, Rohrer sold his majority stock interest and the real estate on which the dealership was located to Kirsch and Marino. Considerable confusion as to the date of settlement on the stock transaction is reflected in the depositions, but it will suffice here to note that settlement as to at least some of Rohrer's shares may not have taken place until February 6, 1974. Deposition of Alan J. Kirsch (hereinafter AJK) 101.

Kirsch notified GMC by letter dated January 11, 1974 that he had acquired Rohrer's stock interest. (This letter served to confirm Kirsch's statements to McLeod made during a telephone conversation earlier that week. AJK 67–68.) The letter was intentionally misleading in two respects. First, it made no mention of Marino, who was co-owner of the Rohrer stock. Second, it stated that Moorehead still retained a twenty-five percent stock interest in Moorehead, Inc., although Kirsch, having bought out Moorehead's interest, knew that Moorehead no longer held any stock in the dealership.

On March 21, 1974, Moorehead's counsel wrote to Kirsch and Marino, charging them with breach of the total agreement of September 11, 1973. GMC Ex. 80. The letter stated that unless Kirsch and Moorehead (1) tendered certain moneys owing in connection with their purchase of Moorehead's stock, and (2) infused capital into the deal-ership as required by their agreement, Moorehead would seek rescission and demand the return of his stock certificates. Although neither condition was satisfied,[2] no formal offer of rescission has been made to date.

On April 8, 1974, GMC wrote to Moorehead, stating that the Moorehead, Inc. franchise would be terminated in sixty days because of the unauthorized transfer of Rohrer's majority stock interest in the dealership. GMC Ex. 66. The letter quoted extensively the provisions of the 1970 dealer franchise agreement requiring Chevrolet's prior written approval of *any* transfer of ownership or management interest in the dealership. In response to the letter, Moorehead unsuccessfully pursued his remedies under the General Motors Dealer Relations Umpire Plan, and ultimately sought injunctive relief in the Court of Common Pleas of Montgomery County. GMC Exs. 70–77. The litigation ended in a stipulation, approved by the court, that the franchise would continue in effect until October 1, 1974, in order to allow Moorehead to locate a buyer for the dealership's assets. GMC Ex. 75. Moorehead, Inc. ceased to operate some time during October of 1974.

On February 26, 1975, GMC entered into a new agreement for a Chevrolet franchise in New Hope. The franchisee was Preston Mintz, whom Moorehead had recommended to GMC as a successor some nine months earlier. GMC, at that time, had found Mintz unqualified and rejected him.

The plaintiff opposes the motions for summary judgment on the Automobile Dealers' Day in Court Act claim and argues that a disputed factual issue exists as to this claim. That issue is whether the plaintiff has standing to sue under the Act. The plaintiff has characterized this as a mixed question of law and fact, but the question whether (on the facts presented) the plaintiff has standing is simply a question of law. There is no genuine issue as to any

---

**2.** Considerable confusion exists in the record as to whether the $10,000 that Moorehead demanded of Kirsch and Marino was the unpaid purchase price for Moorehead's stock, or sim-ply an unrelated sum due under the contract governing transfer of the dealership's assets. MLM 32–33, 80–81, 159, 176–78, 187, 195–96, 198–201.

material fact bearing on the resolution of this question.[3] In an effort to create such an issue, the plaintiff's brief in opposition states that "[p]laintiff intends to prove at trial" that the sale of his stock to Kirsch and Marino is voidable because it was conditioned upon GMC's consent to the transfer. The plaintiff reasons that because the contract is voidable, he retained an equitable interest in the stock conveyed to Kirsch and Marino, and that, in determining his standing to sue, he should be treated as though he still held the stock at the time GMC terminated Moorehead, Inc.'s franchise. Without reaching the merits of the plaintiff's contract argument, however, the record is utterly devoid of evidence to support the contention that the stock transfer was conditioned upon Kirsch and Marino obtaining GMC's consent to their acquisition of the stock. The plaintiff's mere statement of his intention to offer proof at trial does not satisfy Rule 56(e), which requires the party opposing a motion for summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *See Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96–97 (2d Cir. 1970). As a result, I will resolve the standing question on the basis that, at the time GMC terminated Moorehead, Inc.'s franchise, the plaintiff held no stock in Moorehead, Inc.

The question whether the plaintiff has standing to sue turns on whether he was, at the time of the termination, an "automobile dealer" within the meaning of the Act. Section 1222 of title 15 provides:

"An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent . . .."

The term "automobile dealer" is defined in § 1221(c):

"(c) The term 'automobile dealer' shall mean any person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any Territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons."

The plaintiff relies on three cases holding that an individual dealer named in the dealership's franchise agreement can sue the manufacturer in his individual capacity. All three cases represent departures from the general rule that, as to a corporate dealership, "the locus of the right of action is the corporation." *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1120 (2d Cir. 1975). *Accord, Rodrigue v. Chrysler Corp.,* 421 F.Supp. 903, 908 (E.D.La.1976). Two of these cases, moreover, provide little support for the plaintiff. In *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir. 1965), the court permitted the sole individual shareholder (and named operator) of a terminated Ford dealership to sue in his own name. A compelling consideration, present in *Kavanaugh* but not in this case, was that the Ford Motor Company effectively controlled the corporate dealership: Ford owned all the voting stock in the dealership, and controlled three of the four positions on the board of directors. As a result, the court recognized that it was "inconceivable" that the corporation would sue Ford; unless Kavanaugh could sue individually, therefore, Ford would be shielded from liability under the statute. 353 F.2d at 717. Here, in contrast, GMC owned none of the stock

---

**3.** Plaintiff relies on *Lewis v. Chrysler Motors Corp.,* 456 F.2d 605, 606 (8th Cir. 1972), in which the Eighth Circuit reversed a district court decision dismissing the complaint of a franchised automobile dealer for failure to state a claim upon which relief could be granted. As the court noted in *Lewis,* the issue of dealer standing under 15 U.S.C. §§ 1221(c) and 1222 "assuredly presents one of the clearest instances where a District Court should act only on the basis of a clear and well-developed record."

456 F.2d at 607. *Lewis* erected no barrier, however, to the application of summary judgment procedures in cases under the Automobile Dealers' Day in Court Act. It is worth nothing that the district court in *Lewis* acted solely on the basis of the pleadings, before any affidavits or testimony had been received, and that the thrust of the Eighth Circuit's opinion was that the district court should have stayed its hand to allow the development of a factual record.

in Moorehead, Inc., and controlled none of the seats on the board of directors. Nothing, therefore, prevented Moorehead, Inc. from asserting its own cause of action against GMC, and nothing prevented Kirsch and Marino (the sole stockholders at the time the franchise was terminated) from bringing a derivative action on behalf of the corporation in the event that its directors unaccountably failed to act. Thus, the rationale for *Kavanaugh*'s broad view of standing under the Act is inapplicable here.

The Fifth Circuit relied on *Kavanaugh* in *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir. 1971), and recognized standing in two named owner-operators of a franchised dealership. The court noted that these individuals did *not* have standing to sue simply because they were the sole stockholders, the sole officers, and the sole directors of the corporate dealership. 447 F.2d at 790. The court held that they *did* have standing, however, by virtue of the franchise agreement that required their personal and substantial participation in both the ownership and operation of the dealership. Under the court's reading of *Kavanaugh,* this "personal" franchise agreement sufficed to confer standing upon the individual(s) named therein.

Although the franchise agreement in this case is undeniably just as "personal" (with respect to Martin Moorehead) as was the agreement in *York,* I do not read *Kavanaugh* as holding that such an agreement, without more, confers standing on the named owner or operator. The *Kavanaugh* holding rests on an essential premise that, as noted earlier, is missing in this case: if the corporation is effectively prevented from asserting its own cause of action, then the remedial purposes of the Act require a broader recognition of individual standing than is appropriate in the typical case. *See Rodrigue v. Chrysler Corp.,* 421 F.Supp. 903, 907 (E.D.La.1976) (criticizing the decision in *York*). *Kavanaugh* should not be extended to situations in which no necessity exists for taking a broader view of standing under the Act.

One other decision lends some support to plaintiff's argument on the question of standing. In *Rea v. Ford Motor Co.,* 497 F.2d 577 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), Edward C. Rea sought to recover damages sustained by him in his capacity as president and principal stockholder of an Oldsmobile dealership (Rea Oldsmobile, Inc.). In 1964, Rea had obtained a Ford franchise by representing that he would liquidate the assets of Rea Olds, and invest the proceeds in the Ford franchise to be granted to him. After the Ford dealership (Edward C. Rea, Inc.) began operations, however, Rea changed his mind and informed Ford of his intention to leave his invested capital in Rea Olds. Rea later testified that Ford's district manager then threatened to stop shipping automobiles to Rea's Ford dealership unless Rea Olds gave up its Oldsmobile franchise and Rea transferred its capital to the Ford dealership. Rea complied with these demands, although Rea Olds retained some of its assets and was still a going concern. Subsequently, Rea Olds changed its name to 22 Ford, Inc., and took over operation of the Ford dealership. Several months later, Edward C. Rea, Inc., acting with the approval of Ford, assigned its franchise to 22 Ford, Inc. Both Rea and 22 Ford, Inc. later sued Ford, and the jury awarded damages to *22 Ford, Inc.,* representing profits "that Rea Olds would have made if it had continued to operate the Oldsmobile franchise." 497 F.2d at 583.

Ford contended on appeal that the Automobile Dealers' Day in Court Act gave 22 Ford, Inc. a cause of action only for damages sustained "in its capacity as a Ford dealership" by reason of Ford's violation of the Act. 497 F.2d at 583. Since no evidence of such damages was introduced, Ford argued, the jury's verdict was without foundation. The Third Circuit apparently accepted this argument, but it held that, in any event, Rea *as an individual* had standing to sue for the lost profits of the Oldsmobile dealership. The court therefore sustained the jury's verdict, although it remanded for a new trial on the issue of damages.

Of crucial importance here are the court's reasoning and the precise holding in *Rea*. As to the former, the court emphasized the "personal" franchise agreement between Ford and Edward C. Rea, Inc., under which Rea was required to participate actively and substantially in the ownership and operation of the Ford dealership. The court then went on to say:

> "Rea, therefore, had a cause of action under the Automobile Dealers' Act against Ford for any bad faith in coercing him, as *President and principal stockholder of Rea Olds,* to surrender the Oldsmobile franchise and to recover damages suffered by Rea Olds as a result of such surrender." 497 F.2d at 584. (Citation omitted, emphasis supplied.)

Plaintiff would rely on *Rea* for the broad proposition that an individual named in a "personal" franchise agreement invariably has standing to sue the automobile manufacturer. Because Moorehead was designated as Owner and Operator in the GMC franchise agreement, the argument runs, he can sue GMC under the Act. In *Rea,* however, the Third Circuit invoked two considerations in reaching its conclusion. One was the substantial relationship between the plaintiff and the defendant manufacturer, evidenced by the "personal" franchise agreement. The other consideration was the relationship between Rea and the corporate dealership. As shown by the italicized language in the quotation set out above, the Third Circuit relied on Rea's status as president and principal stockholder of Rea Olds in determining that Rea had standing to sue to recover damages resulting from the coerced termination of the Oldsmobile franchise. Plaintiff seeks to extend *Rea* to this case, despite the fact that at the time GMC terminated Moorehead, Inc.'s franchise, plaintiff had resigned as president of Moorehead, Inc. and had transferred his entire stock interest in the corporation. Although the "personal" franchise agreement still named Moorehead as Owner and Operator of the dealership, his only other tie with Moorehead, Inc. was his employment by the corporation as general manager of the dealership. In short, the second consideration supporting the *Rea* holding is wholly lacking here.

The rationale underlying this second requirement for individual standing is apparent. If the only requirement for individual standing were the existence of a "personal" franchise agreement, then virtually every case under the Act would become an exception to the general rule that the corporation, rather than an individual shareholder or employee, has standing to enforce the antitrust laws. *E. g., Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Ash v. International Business Machines, Inc.,* 353 F.2d 491 (3d Cir. 1965); *Wobb v. Ford Motor Co.,* 1977–1 Trade Cases (CCH) ¶ 61,268 (W.D.Pa.1975), *aff'd per curiam,* 546 F.2d 421 (3d Cir. 1976), *cert. dismissed,* 430 U.S. 923, 97 S.Ct. 1344, 51 L.Ed.2d 603 (1977). No court has yet held that Congress, in enacting the Automobiles Dealers' Day in Court Act, sought to overturn this rule in all cases involving the automobile industry. *See also Vincel v. White Motor Corp.,* 521 F.2d 1113, 1120 (2d Cir. 1975). Nor is any such intent apparent from the legislative history of the Act. *See* H.R.Rep.No.2850, 84th Cong., 2d Sess., *reprinted in* [1956] U. S. Code Cong. & Admin. News, p. 4596. Accordingly, individual standing should ordinarily be recognized only where, as in *Rea,* the plaintiff has extensive control over the corporation's activities as well as the dominant financial interest in the corporation. This requirement, of course, is imposed *in addition to* the requirement of a very substantial relationship with the manufacturer, such as that evidenced by a "personal" franchise agreement.

██ Further support for this restrictive interpretation of *Rea* can be drawn from an examination of the peculiar facts of that case. *Rea,* like *Kavanaugh,* presented a situation in which only the individual plaintiff could assert the dealership's rights under the Act and, for this reason, the court may have taken a somewhat broader view of individual standing than is usually appro-

priate. A brief consideration of the three corporate entities involved in *Rea* suggests strongly that none of them had standing to recover damages suffered by the Oldsmobile dealership. To begin with, Rea Olds itself lacked standing because the Act creates a cause of action only "where a manufacturer is guilty of coercion and intimidation in its dealings with *its* franchise holders," and Rea Olds obviously did not hold a Ford franchise. *Hanley v. Chrysler Motors Corp.,* 433 F.2d 708, 710–11 (10th Cir. 1970) (emphasis supplied). "Unquestionably, the Act does not apply until a manufacturer-dealer relationship has been created." *Lewis v. Chrysler Motors Corp.,* 456 F.2d 605, 606–07 (8th Cir. 1972). Second, Edward C. Rea, Inc., which held the Ford franchise operated by Rea throughout the relevant time period, was in no way injured by the coerced termination of Rea Olds' franchise, and therefore had no cause of action against Ford. *Rea v. Ford Motor Co.,* 560 F.2d 554, 558 (majority opinion), 559 (Gibbons, J., dissenting) (3d Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). Finally, 22 Ford, Inc., as successor to Rea Olds, arguably acquired whatever cause of action the latter had against Ford. For the reason given previously, however, Rea Olds had *no* cause of action against Ford, and therefore none could have been acquired by 22 Ford, Inc. The *Rea* court apparently accepted this last argument, for it shifted a jury verdict in favor of 22 Ford, Inc. over to Rea in his individual capacity. 497 F.2d at 584; *Rea v. Ford Motor Co.,* 560 F.2d 554, 557 (3d Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). Thus, *Rea* may be viewed as an exceptional case—not unlike *Kavanaugh*—in which only the individual plaintiff was in a position to assert the dealership's statutory rights. As I noted earlier in connection with *Kavanaugh,* this case does not present that exceptional situation, and the plaintiff therefore cannot rely on *Rea* to confer standing upon him.

For the reasons set out above, the plaintiff lacks standing to sue under the Automobile Dealers' Day in Court Act. GMC's motion for summary judgment will there-fore be granted as to the first cause of action.

■ The three remaining causes of action stated in the complaint are based on Pennsylvania law. Had the federal statutory claim survived these summary judgment motions and been tried on the merits, the remaining three claims might properly have been heard under the doctrine of pendent jurisdiction. *See generally Hagans v. Lavine,* 415 U.S. 528, 545–48, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). One issue that would have arisen in deciding that question is the propriety of federal jurisdiction over pendent nonfederal parties, as all three state law claims run against such parties. *See generally Aldinger v. Howard,* 427 U.S. 1, 15–16, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). These issues are no longer material, however, as the federal claim has been dismissed. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the leading case on pendent jurisdiction, the Supreme Court stated:

"Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted).

*See Broderick v. Associated Hosp. Serv.,* 536 F.2d 1, 8 n. 25 (3d Cir. 1976); *Braden v. University of Pittsburgh,* 477 F.2d 1, 4 n. 5. (3d Cir. 1973). Therefore, the plaintiff's three remaining claims must be dismissed unless an independent jurisdictional basis for them can be found.

Plainly, this action cannot be maintained in its present form on the basis of diversity jurisdiction. The plaintiff is a citizen of Pennsylvania, as are defendants Kirsch and Marino. Complaint ¶¶ 2, 5, 6. Defendant Rohrer is a citizen of New Jersey. Deposition of William G. Rohrer 2. The parties have not addressed themselves to the matter of GMC's citizenship for purposes of diversity. In any event, the current diversity jurisdiction statute, 28 U.S.C. § 1332(a)

(1970), and its predecessors have uniformly been read to require *complete* diversity of citizenship. *Treinies v. Sunshine Mining Co.,* 308 U.S. 66, 71, 60 S.Ct. 44, 84 L.Ed. 85 (1939); *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Fawvor v. Texaco, Inc.,* 546 F.2d 626 (5th Cir. 1977); *Wolgin v. Atlas United Fin. Corp.,* 397 F.Supp. 1003 (E.D.Pa.1975). Thus, even if diversity jurisdiction could properly be asserted as to Rohrer and GMC, the action cannot be maintained given the present alignment of the parties.

Inasmuch as no basis exists for the exercise of federal jurisdiction over the state law claims, the complaint is dismissed in its entirety. I therefore need not rule on defendant Rohrer's motion for summary judgment.