**WESTSIDE–MARRERO JEEP EAGLE, INC., et al.**

v.

**CHRYSLER CORP., INC., et al.**

No. Civ.A. 97–3012.

United States District Court,
E.D. Louisiana.

July 20, 1999.

Karen McCarthy and Lanny of Zatzkis & Associates, New Orleans, LA, for Plaintiffs.

Marie Riccio Wisner, New Orleans, LA, for Defendant Alfred Stevens.

Gwen Young & Mark Kennedy of Wheeler, Trigg & Kennedy, P.C., Denver, CO, for DaimlerChrysler.

Charles Hamilton of Lamothe & Hamilton, New Orleans, LA, for Chrysler Fin./Realty.

Stephen Rider & Anthony Rollo of McGlinchy, Stafford, New Orleans, LA, for Chrysler Financial, Chrysler Realty, and DaimlerChrysler.

Robert Kerrigan of Deutsch, Kerigan & Stiles, New Orleans, LA, for Daimler.

## ORDER AND REASONS

DUVAL, District Judge.

Before the court are several motions, including a Motion to Dismiss, filed by defendant Chrysler Financial Corporation (Doc. # 309); a Motion to Strike Jury Demand, filed by defendant Chrysler Financial Corporation (Doc. # 313); a Motion for Reconsideration, filed by plaintiffs Westside–Marrero Jeep Eagle, Inc., Walter Stubbs, and Kathleen Stubbs (Doc. # 341); a Motion to Review Magistrate's Order of 5–5–99, filed by plaintiffs Westside–Marrero Jeep Eagle, Inc., Walter Stubbs, and Kathleen Stubbs (Doc. # 367); a Motion to Review Magistrate's Ruling of 6–4–99, filed by plaintiffs Westside–Marrero Jeep Eagle, Inc., Walter Stubbs, and Kathleen Stubbs (Doc. # 400); a Motion to Vacate Order Consolidating Cases, filed by defendant DaimlerChrysler Corporation (Doc. # 405); and a Motion to Vacate Order Consolidating Civil Action Nos. 97–3012 and 99–1200 by defendant Chrysler Financial Corporation (Doc. # 404).

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs are Westside–Marrero Jeep–Eagle, Inc. ("Westside"), and Walter and Kathleen Stubbs, Westside's owners. Their case arises out of a series of events that occurred following Chrysler's merger with American Motors Corporation ("AMC"), when acquired it the Jeep–Eagle product. According to the plaintiffs, during the early 1990's, Chrysler implemented a plan called "Project 2000." The goal of this plan as described by the plaintiffs was to eliminate Jeep–Eagle dealerships and turn over the Jeep–Eagle franchises to established Chrysler dealers, who had no sports-utility vehicles to sell despite a booming market. Plaintiffs claim that Chrysler denied them access to adequate inventory, effectively forcing them out of business, and that Chrysler then coerced plaintiffs into relocating to Laplace, Louisiana, a less desirable "secondary market," outside of the metro New Orleans area. In so doing, Chrysler provided the plaintiffs with financial information about Murphy–Graham, Inc., the dealership plaintiffs acquired in Laplace.

Plaintiffs claim that once they relocated to Laplace, it became obvious that much of this financial information had been overstated by Chrysler, and, in some instances, fabricated. In addition, their petition alleges a series of misconduct by Chrysler and its employees beginning in 1987, including, *inter alia*, Chrysler's refusal to honor plaintiffs' agreement to buy out stock, refusal to allow Westside to add Subaru and Volkswagen product in 1991, misuse of the allocation system from 1992–1997, forcing Westside to participate in the New Orleans metropolitan realignment in 1995 and 1996, withholding allocation and misrepresenting the financial status and profitability of the Laplace dealership, refusal to renew Westside's lease, forcing Westside to incur unnecessary debt, and attempting to eliminate Westside by harassing it with unnecessary audits, all in violation of the Automobile Dealer's Day in Court Act ("ADDCA") and state law prohibiting breach of contract, fraud, and negligent misrepresentation.

Plaintiffs' original petition was filed in state court in Jefferson Parish and was removed by defendants to federal court in September 1997, Section "B", Judge Ivan Lemelle presiding. The petition alleges ten causes of action against DaimlerChrysler, otherwise known as Chrysler Corporation, Inc. ("Chrysler"); Chrysler Financial Corporation ("CFC"); and Chrysler Realty Corporation ("CRC"). In their petition, plaintiffs also claimed that a Chrysler employee named Al Stevens bribed and/or extorted them. On June 10, 1998, Chrysler Corporation, Inc. filed a counterclaim against Westside–Marrero Jeep Eagle, Inc. and Walter Stubbs, accusing them of acts of fraud, breach of fiduciary duty, conspiracy, intentional interference with contractual relations, and breach of contract arising out of their compliance with Stevens' alleged demands.

On March 9, 1999, Judge Lemelle issued an Order ruling against plaintiffs in their Rule 12(b)(6) Motion to Dismiss Chrysler Corporations, Inc.'s counterclaim. On March 26, 1999, Judge Lemelle granted in part DaimlerChrysler's Rule 12(b)(6) Motion to Dismiss several of the claims in plaintiffs' petition. The claims dismissed Judge Lemelle's ruling include Westside's claims for: violation of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"), breach of fiduciary duty, intentional infliction of emotional distress, wrongful hiring and negligent supervision, and the violations of the Louisiana Motor Vehicle Act ("LMVA").

CFC and CRC did not join in Daimler-Chrysler's motion. On April 5, 1999, CFC filed its own Motion to Dismiss, arguing that the claims the court dismissed as to DaimlerChrysler should by the same logic be dismissed as to CFC. (CRC did not file a similar motion, and at the status conference held before this court on June 18, 1999, counsel for CRC explained that it was CRC's position that it was included in Judge Lemelle's March 26, 1999 dismissal of plaintiffs' claims, so it believed that no motion was necessary).

Plaintiffs opposed CFC's motion, and in their opposition, moved for reconsideration of both Judge Lemelle's March 9, 1999 Order and his March 26, 1999 Order.

On April 5, 1999, CFC also filed a Motion to Strike Jury Demand. This motion is still pending before this court.

In April 1999, Chrysler filed a separate action against its former employee, Al Stevens, captioned *DaimlerChrysler Corporation v. Alfred S. Stevens, Jr.*, C.A. No. 99–1200, in which Chrysler alleged that Stevens bribed and extorted Stubbs, just as the plaintiffs claimed in their petition and Chrysler claimed in its counterclaim against Stubbs. In this second suit, Chrysler also alleged additional breaches of Stevens' fiduciary duties to Chrysler, breach of his employment contract, and fraud based on his disclosure of confidential information to Westside.

On May 5, 1999, U.S. Magistrate Judge Sally Shushan ruled on Westside's Motion for Leave to File an Amended and Supplemental Complaint. Westside's proposed amended complaint alleged a new cause of action under the Racketeering and Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.* and several causes of action retained from the original petition. Judge Shushan denied the Motion to Amend, for several reasons, including the following: (1) the motion was untimely by nine months; (2) Westside knew of its potential RICO claim before the amendment deadline of June 18, 1998, because counsel for Westside discussed the potential claim at a preliminary pre-trial conference before Magistrate Judge Wilkinson held on May 19, 1998; (3) Westside had sufficient evidence to allege the RICO claim by January 6, 1998, and therefore could have amended its complaint in a timely fashion; (4) the proposed amendments to the complaint failed to cure the defects in the claims dismissed by Judge Lemelle in his March 26, 1999 Order; and (5) allowing the amended complaint would impose prejudice and cost to the defendants. Magis-

trate Shushan intimated that the RICO claim was probably meritless, but did not make an express holding on the merits of the RICO claim because "untimeliness alone is often sufficient reason to deny leave to amend," (citing *Avatar Exploration, Inc. v. Chevron USA, Inc.*, 933 F.2d 314, 321 (5th Cir.1991)).

On May 20, 1999, Judge Lemelle recused himself from this case following his wife's purchase of a Jeep Grand Cherokee. The case was reassigned to Section "F," Martin L. Feldman, District Judge. Judge Feldman recused himself on June 1, 1999, as he is the owner of a Mercedes.

On June 4, 1999, the Chrysler versus Stevens case was transferred to this court from Judge Lemelle as a "related case" to the Westside litigation. The Stevens case was consolidated with the lead case by this court on June 14, 1999. On June 29, CFC and DaimlerChrysler each filed motions asking the court to deconsolidate this case from the Stevens litigation. The motions are opposed by defendant Stevens and by the Westside plaintiffs.

On June 17, 1999, plaintiffs filed a Motion for Review of yet another of Magistrate Shushan's orders, this one dated June 4, 1999. In that Order, Judge Shushan granted Chrysler a protective order. Plaintiffs now seek to have that protective order dissolved as to two areas of inquiry: Chrysler's knowledge of the relevant market area and realistic sales potential for the Laplace location and Chrysler's alleged misrepresentation of same in order to accomplish its goals.

The court will address each motion in turn.

## I. PLAINTIFFS' MOTION FOR RECONSIDERATION OF JUDGE LEMELLE'S ORDERS OF 3–9–99 AND 3–26–99 AND CFC'S MOTION TO DISMISS

Judge Lemelle's March Orders concerned several individual claims. CFC seeks to have this court declare that the claims dismissed by the March 26, 1999 order should be extended to all defendants. Plaintiffs seek reconsideration of all of the dismissals of its claims, and also seek reconsideration of the Order of March 9, 1999 denying plaintiff's Motion to Dismiss.

### A. Applicable Legal Standards

#### 1. Standard for Reviewing a Previous Ruling in a Case

■ Generally, the doctrine of "law of the case" is a "rule of practice based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." *Loumar v. Smith*, 698 F.2d 759, 762 (5th Cir.1983) (quoting *United States v. United States Smelting, Refining & Mining Co.*, 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950)). But the doctrine is not an inexorable command. A court will follow a ruling previously made unless the prior ruling was erroneous, is no longer sound, or would work an injustice. *Id.* The court explained the doctrine in *Loumar*:

> [W]hen a district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision. 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478 at 788, 794–95 (1981).
>
> The law of the case doctrine is not, however, a barrier to correction of judicial error. It is a rule of convenience and utility and yields to adequate reason, for the predecessor judge could always have reconsidered his initial decision so long as the case remained in his court. Therefore, his decision should not bind a successor with jurisprudential straps stronger than those that compel him to adhere to an opinion once rendered. *See Abshire v. Seacoast Products, Inc.*, 668 F.2d 832, 837–38 (5th Cir.1982). *Id.*

The court will accordingly scrutinize the March 9, 1999 and March 26, 1999 deci-

sions rendered by the previous judge for rulings that are "erroneous, [are] no longer sound, or would work an injustice."

## 2. Standard for Rule 12(b)(6) Motion to Dismiss

In considering the court's previous rulings under the standard outlined above, the court bears in mind that the motions in question, filed both by Chrysler and by the Westside plaintiffs, were Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6), a defendant may move to dismiss a case where the plaintiff has failed to state a claim upon which relief can be granted. In reviewing a 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual allegations as true and construe them in favor of the non-moving party. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir.1995). A 12(b)(6) dismissal will not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief. *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The court is not required to "conjure up unpled allegations" to save a complaint. *Systems Contractors Corporation v. Orleans Parish School Board, et al.*, 1996 WL 547414,*1, (E.D.La.1996) (citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988)).

The court also notes that under the Federal Rules of Civil Procedure, litigants are not required to plead each and every fact upon which they base their claims. Rule 8 of the Federal Rules reads in part as follows:

(a) Claims for Relief. A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain

(1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief, and

(3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

This form of pleading, known as "notice pleading," does not require a lengthy litany of facts. In fact, the Federal Rule goes on to require litigants to keep the averments in their pleadings "simple, concise, and direct." Fed.R.Civ.Pro. 8.

## B. Analysis

### 1. The Stubbs's ADDCA Claims

The court correctly dismissed all claims made by Kathleen Stubbs under the ADDCA. Kathleen Stubbs was not a party to the Sales and Service Agreements ("SSAs") under which plaintiffs argue the claims arise. The court now extends this holding to any individual claims brought by Kathleen Stubbs under the ADDCA against CFC.

■ The court's decision to dismiss the ADDCA claims of Walter Stubbs, however, was clearly erroneous, and allowing the ruling to stand could work an injustice against plaintiff Stubbs. The proper analysis for considering whether the stockholders of a corporate automobile dealership have standing to bring an ADDCA claim was set forth in *York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir.1971).

In that case, plaintiff York and his son were the president and vice-president of York Chrysler–Plymouth, Inc., and together owned the entirely of the corporate stock. After Chrysler Credit Corporation conducted an audit and discovered that the dealership had sold 22 cars "out of trust," Chrysler Credit seized the assets of the dealership. Two months later, Chrysler Motors let the dealership agreement with York Chrysler–Plymouth, Inc. expire of its own accord.

The Yorks brought suit individually and in the name of the corporation, asserting ADDCA claims against Chrysler Motors and Chrysler Corporation. The Fifth Circuit held that individual plaintiffs do not come within the scope of the Act merely because they are sole stockholders, officers and directors of the corporate franchise holder. *See York*, 447 F.2d at 790 (citing *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893 (5th Cir.1968) and *Martens v. Barrett*, 245 F.2d 844 (5th Cir.1957)). The court went on to explain, however, that in the York's case because the franchise agreement explicitly conditioned the issuance and continuation of the dealership relationship upon the active participation of the Yorks, the Yorks had individual standing to pursue an ADDCA claim:

> [W]e believe the Yorks were made essential to operation of the dealership by the agreement with Chrysler Motors. The Direct Dealer Agreement held by the Yorks at the old location recited that Chrysler Motors Corporation "has entered this agreement relying on the active, substantial and continuing personal participation" of C.C. York and Jerry A. York, required them to maintain beneficial ownership and control of the stock in the dealership corporation, could be terminated if either of them died or failed to continue in the active management of the dealership or was convicted of certain crimes, and could even be terminated if Chrysler Motors thought that a disagreement between them might adversely affect the business. *York*, 447 F.2d at 790–91.

The court finds that this case falls clearly within the exception outlined in *York*. In fact, the franchise agreement signed by plaintiffs in this case is almost identical to the agreement in the *York* case. Plaintiffs claim that the only inadequacy in their complaint that prevents it from falling within the rubric of *York* is a single sentence: "Plaintiffs were required by the franchise contract to participate in the management and operation of the dealership." However, under notice pleading, alleging an ADDCA claim and attaching the contract that includes the language is already adequate to properly state a claim upon which relief may be granted, and the court finds that no amendment is necessary.

The *York* case bears some comment, since scholars, practitioners, and other circuit courts have looked on it with disapproval. The *York* court relied on an ADDCA case from another circuit in reaching its decision, *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710 (7th Cir.1965). The *Kavanaugh* case relied in large part on the fact that Ford Motor Company retained a controlling stock interest in the dealership corporation, so the individual plaintiffs were the only parties or entities that could sue under the ADDCA. The *Kavanaugh* case also mentioned the integral nature of the plaintiffs in the day-to-day operations of the dealership, a theme caught up by *York* even in a situation where there was no impediment to the corporate entity bringing suit itself. In the *York* case, unlike the *Kavanaugh* case, the Yorks owned the dealership's voting stock and were able to cause the corporate dealership to assert a claim on its own behalf. 447 F.2d at 790. In fact, the York dealership did so, and the corporation recovered a judgment in the case. *Id.*

Several courts, including the Eastern District of Louisiana, have criticized *York* for extending *Kavanaugh* to situations where the corporation could recover on its own. *Rodrigue v. Chrysler Corp.*, 421 F.Supp. 903, 907 (E.D.La.1976); *see also Vincel v. White Motor Corp.*, 521 F.2d 1113 (2d Cir.1975) ("when, as here, a dealership is doing business in corporate form, the statute contains no hint that it intends a departure from the established principle that the locus of the right of action is the corporation."). Here, the court in its earlier ruling relied on the *Rodrigue* decision in determining that Walter Stubbs did not have individual standing to sue under the ADDCA. But the court in *Rodrigue* did

not adequately distinguish *York*. Instead, it lumped *York* with *Kavanaugh*, and held that because Rodrigue Dodge was still viable and could sue Chrysler under the ADDCA, and Bruce Rodrigue, as an individual, was claiming no damages except those derivative of his corporation, that the situation was distinguishable from the "York–Kavanaugh decisions" even though the situation was precisely the same situation that was before the court in *York*.

The court joins the court in *Rodrigue* and other courts in their belief that the *York* decision was likely misguided. However, *York* is still good law in the Fifth Circuit. No party was able to provide the court with any evidence that the Fifth Circuit has even inferentially overruled *York*. This court is therefore bound to follow the law of its circuit and apply *York*. Accordingly, the court reconsiders its earlier ruling and finds that Walter Stubbs's has standing to bring individual ADDCA claims.

The court takes no position on the issue of what it means for Walter Stubbs to have an individual ADDCA claim. It may well be that the ADDCA provides relief only for damages suffered by the corporation or derivative of the corporation. The granting of plaintiffs' Motion for Reconsideration on this issue may therefore prove to be a Pyrrhic victory for Walter Stubbs. The issue of the scope of relief available under the ADDCA, however, is not before the court at this time.

### 2. The Stubbs's State Law Claims.

The court's previous ruling also held that neither Walter nor Kathy Stubbs had standing to bring state law claims independent of the corporation. In reaching this conclusion, the court relied on *Joe Conte Toyota Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 689 So.2d 650, 654 (La.App. 4th Cir. 1997). The Stubbses argued that they used their personal funds from rental property, not funds from the corporation, to pay the extortion demands by Chrysler employees, that Kathleen Stubbs convert-ed personal funds to the personal benefit of Chrysler employees, and that Kathleen Stubbs was forced to personally guarantee obligations by CFC and to subordinate her security interests in favor of CFC.

The source of the money the Stubbses allegedly used to pay the extortion demands by Chrysler's employees is irrelevant. A guarantor of corporate obligations has no standing to sue for injury to the corporation. *Joe Conte Toyota Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 689 So.2d 650, 654 (La.App. 4th Cir.1997) (citing *Lakeside National Bank v. Vinson Bros.*, 607 So.2d 1009, 1011 (La.App. 3d Cir.1992) and *Eximco, Inc. v. Trane Co.*, 737 F.2d 505, 511 (5th Cir.1984)). Neither does a guarantor have standing to sue individually for personal losses incurred as guarantor, even in the presence of breach of contract, fraud, conspiracy, or other wrongful misconduct. *Id.* (citing *Nowling v. Aero Services International, Inc.*, 752 F.Supp. 1304, 1316 (E.D.La.1990) and *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir.1981)). The state law claims of Walter and Kathleen Stubbs against Daimler-Chrysler were properly dismissed, and the court now extends this ruling to include defendant CFC as well.

### 3. Westside's Breach of Fiduciary Duty Claim

The court's previous ruling dismissed Westside's breach of fiduciary claim because it found that (1) there is generally not a fiduciary duty between franchisors and franchisees, and (2) there was no allegation of a special brokerage agreement that would give rise to a fiduciary duty. The court finds no clear error in this ruling. Plaintiffs have offered no new legal bases on which this court might change the ruling. They do, however, argue that the ruling should not be extended to dismiss Westside's breach of fiduciary duty claims against CFC, claiming that CFC, as a financial institution, was in a lender-borrower relationship with the plaintiffs, rather than the franchisor-franchisee relation-

ship entered into by DaimlerChrysler and the plaintiffs.

Plaintiffs allege that a fiduciary arose between CFC and Westside because the parties were in a "special relationship." As the Louisiana Supreme Court has stated: "Although the creditor-debtor relationship does not normally impose an independent duty of care on the part of the creditor, that relationship may give rise to such a duty in certain circumstances." *Trans–Global Alloy Ltd. v. First Nat. Bank*, 583 So.2d 443, 452 (La.1991). In that case, the defendant bank held in trust, as pledgee, plaintiff Trans–Global's letter of credit from another bank. *Id.* A jury found that the defendant bank breached either a contractual or a fiduciary duty to Trans–Global when it refused to issue a second letter of credit until its first letter was paid, even though it knew that issuance of a second letter was necessary for product to be shipped, and that the plaintiff could not pay the first letter without first receiving the product. *Id.* at 448. The court held that, because of the special "trust relationship" that arose when the bank took on the role of pledgee with the "attendant duties to protect the debt or the obligation and the collateral," a reasonable jury could have found that the bank breached a fiduciary duty to Trans–Global. *Id.* at 453 (citing *In re Pan American Life Ins. Co.*, 88 So.2d 410, 415 (La.App. 2d Cir.1956)).

Plaintiffs argue that the situation here is similar to the one in Trans–Global. They claim that CFC employees failed to disclose certain facts to the plaintiffs: that the books and records were fraudulently altered to make the dealership's financial status appear better than it actually was, that the audits were bad, and that the Murphy–Graham group was in need of millions in working capital. Plaintiffs further contend that not only did CFC fail to disclose material facts to plaintiffs, but that CFC actually represented to plaintiffs that the Laplace sales point was doing well. Plaintiffs claim that the "special re-lationship" entered into by CFC vis-à-vis the plaintiffs was a brokerage relationship, whereby CFC initiated the deal, made the contacts between the dealers, and funneled and fabricated information to facilitate the sale that benefitted CFC and Chrysler.

Plaintiffs may be correct that their relationship with CFC was sufficiently similar to the relationship between the parties in *Trans–Global* to create a fiduciary relationship under that case's holding. Subsequent to the *Trans–Global* decision, however, the Louisiana Legislature enacted a statute directly addressing this issue:

> No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary. LSA–R.S. 6:1124.

Louisiana case law indicates that this statute effectively overruled the *Trans–Global* case. For example, in *Guidry v. Bank of LaPlace*, 661 So.2d 1052 (La.App. 4 Cir. 1995), the court states, "prior to the enactment of La.Rev.Stat. 6:1124, an independent duty of care was not imposed on the bank in the absence of special circumstances" and cites to the *Trans–Global* case. The court then held that the trial correct incorrectly instructed the jury to consider whether "special circumstances" existed, rather than instructing the jury using La. R.S. 6:1124. *Id., see also Whitney National Bank v. Chatelain*, 1992 WL 73345,*7 (E.D.La., Schwartz, J.) (implying that 6:1124 statutorily overruled *Trans–Global*).

■ Here, there is an absence of any written, express agreement between the parties whereby a fiduciary relationship was established. *Oliver v. Central Bank*, 658 So.2d 1316, 1324 (La.App. 2d Cir.), *writ denied* (1995); *see also Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La.1992)

("ordinarily, a bank and depositor have a debtor-creditor relationship with no independent duty of care imposed on the bank"). While the court has not expressly found CFC to be a "bank" within the meaning of the statute, such a finding is not necessary. The *Guidry* and *Whitney Bank* cases indicate a general disapproval of the *Trans–Global* case subsequent to the passage of La. R.S. 6:1124. The logic of these decisions extends not only to banks but to institutions who perform banking functions, such as borrowing and lending. It was clearly the intent of the Louisiana Legislature to hold lending institutions liable only in specific circumstances as outlined by the statute. CFC clearly falls under the rubric of La. R.S. 6:1124 either directly or by analogy and does not owe a fiduciary duty to its borrowers absent a written agreement as provided in La. R.S. 6:1124. Accordingly, the court finds that the March 26, 1999 Order dismissing the plaintiffs' breach of fiduciary duty claims against DaimlerChrysler should be extended to dismiss plaintiffs' breach of fiduciary duty claims Chrysler Financial Corporation as well.

### 4. Westside's Negligent Supervision Claim.

■ The court's previous ruling properly dismissed Westside's Negligent Supervision claim. Under Louisiana law, employers generally have "no duty to protect others from the criminal activity of third persons." *Smith v. Orkin Exterminating Co., Inc.*, 540 So.2d 363, 366 (La.App. 1st Cir.1989). A duty arises only in certain narrow instances, where an employer hires an employee "who in the performance of his duties will have a unique opportunity to commit a crime against a third party." In those cases, the employer has "a duty to exercise reasonable care in the selection of that employee," and in some "unique circumstances" that employer has "a continuing duty to exercise reasonable care in the retention its employees." *Id.* For example, an exterminating company has a duty to exercise reasonable care in hiring and retaining employees because the unique nature of its business "requires that it send its employees directly into customer's homes." *Id.* at 367. *See also, Lou–Con, Inc. v. Gulf Building Services, Inc.,* 287 So.2d 192 (La.App. 4th Cir.1973), *writs denied,* 290 So.2d 899 (La.1974), 290 So.2d 901 (La.1974) ("employers hiring people such as janitors, or for positions which allow employees into customers' or tenants' premises," may be required to "use reasonable care in checking their criminal background before hiring them").

■ Here, plaintiffs have failed to show that Chrysler had a duty to protect them from its employees. In addition, even assuming that it did, plaintiffs have not alleged that Chrysler breached its duty by hiring employees with criminal records or without first checking their criminal background, or that the employees in question even had criminal records at all. Accordingly, the court denies to reconsider the dismissal of Westside's negligent supervision claim and extends its holding to include CFC.

### 5. Chrysler's Breach of Fiduciary Duty, Fraud, and Conspiracy Counterclaim

The court declines to reconsider its previous ruling retaining Chrysler's claims of breach of fiduciary duty, fraud, and conspiracy. Chrysler's claims are distinguishable from the breach of fiduciary duty claim brought by Westside and dismissed by Judge Lemelle, because Chrysler's claim is based not on any duty between franchisor and franchisee, but on the theory that Stevens, as an employee of Chrysler, had a duty to Chrysler arising out of his agency and employment relationship with Chrysler, that Stevens breached that duty by committing economic torts against Chrysler, and that Stubbs may be held liable as a conspirator or as a joint tortfeasor if he conspired in bad faith with Stevens, an agent, to do the act that breached Steven's duty. *See C & B Sales*

& *Service, Inc. v. McDonald,* 95 F.3d 1308, 1315–16 (5th Cir.1996).

The court expressed interest in its March 9, 1999 Order as to whether Chrysler could bring this claim when Stevens was its employee at the time of the alleged conspiracy. The court suggested that Chrysler might be vicariously liable for any torts Stevens may have committed, and therefore might be barred from suing Stevens on this claim. Without a viable claim against Stevens, Chrysler would likewise have no claim against Walter Stubbs. The court's ruling in no way passed judgment on Chrysler's breach of fiduciary duty claim; it merely retained the claim and encouraged the parties to use discovery to create a fuller record, while suggesting that the issue of vicarious liability was important and might ultimately bar the claim. *See Order of 3–699,* "Exhibit B" to Plaintiff's Opposition to Motion to Dismiss and Motion for Reconsideration. The Order does not exhibit clear error or manifest injustice, and the court declines to reconsider it.

### 6. Chrysler's Intentional Interference with Contractual Relations Counterclaim

█ In its March 9, 1999 Order, the court failed to dismissed Chrysler's intentional interference with contractual relations claim. According to the plaintiffs, under *9 to 5 Fashions v. Spurney,* 538 So.2d 228, 234 (La.1989), the court should have dismissed Chrysler's claim because Chrysler did not plead or prove any contractual provision of the franchise agreement that was breached by plaintiffs. The *Spurney* case sets out the elements required to state a claim for intentional interference with a contract:

For purposes of analysis, the action against a corporate officer for intentional and unjustified interference with contractual relations may be divided into separate elements: (1) the existence of a contract or a legally protected interest between the plaintiff and the corpora-

tion; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Spurney,* 538 So.2d at 234.

Nowhere does the *Spurney* case require a claimant to actually plead the words of the elements or plead the specific contractual provisions of the subject agreement that was breached. Chrysler has claimed that Westside wrongfully subverted the use of Chrysler's vehicle allocation system for its own purpose and that it bribed a Chrysler employee. If these allegations are true, Westside might be held liable under the test outlined in *Spurney.* As the Federal Rules do not require fact pleading but only notice pleading, the court finds no clear error in the court's prior ruling and declines to reverse the ruling.

### 7. Argument that Chrysler's Claims have Prescribed

█ Under federal law, the limitations period in a fraud case commences when the aggrieved party has:

[E]ither knowledge of the violation or notice of facts, which, in the exercise of due diligence, would have led to actual knowledge thereof ... thus the limitations period applicable to a cause of action for fraud ... does not being to run until the plaintiff discovers, or in the exercise of reasonable diligence should discover, the alleged fraudulent conduct ... the requisite knowledge that a plaintiff must have to begin the running of the limitations period is merely that of the facts forming the basis of his cause of action, not that of the existence of the cause of action itself.

*Jensen v. Snellings,* 841 F.2d 600 (5th Cir.1988).

Plaintiffs argue that Chrysler's counterclaim is prescribed under this standard because Chrysler knew as early as 1993 that its employees had been involved in misconduct and extortion, and that under *Jensen,* Chrysler had an obligation to investigation and bring suit within a year. Chrysler claims that all it knew in 1993, however, was that there were allegations that employee Novelly traded Sugar Bowl tickets for airline tickets in violation of Chrysler policy. In 1995, Chrysler investigated allegations that Novelly had accepted gifts from a dealership wholly unrelated to Westside–Marrero in violation of Chrysler policy. In 1997, Chrysler began an investigation of expense reports that Stevens submitted to Chrysler for reimbursement. As a result, Stevens admitted in July of 1997 that he falsified these reports, and resigned. According to Chrysler, none of these investigations gave Chrysler sufficient information upon which to base a suit against Stevens and Stubbs for unlawfully obtaining new Chrysler vehicles through extortion, and Chrysler did not learns of the details of the specific scheme until it received the draft petition in the Westside case on June 17, 1997. Therefore, Chrysler claims, its June 1998 counterclaim was filed within the one-year prescriptive period.

The issue of prescription involves questions of fact that the court is unable to resolve on a Rule 12(b)(6) motion. The court therefore declines to find at this time that Chrysler's counterclaim is prescribed.

### 8. Status of Plaintiffs' Claims Against CRC

Finally, the court notes that CRC did not join in CFC's motion to dismiss. Any claims made by plaintiff regarding CRC that are identical to the claims made and dismissed against Chrysler and CFC may be dismissed using the same logic. However, as CRC has filed no motion to dismiss, the court cannot extend its rulings to CRC at this time. The court will consider a proper motion to extend the rulings to CRC when it is filed.

## II.  MOTION TO STRIKE JURY DEMAND

In securing loans from CFC, Walter and Kathleen Stubbs signed several contracts that included clauses waiving their right to a jury trial. For example, on July 15, 1996, they entered into a security agreement with CFC. On the 10th and 11th pages of the 11–page document, just before the signature block, appears the only section of the entire contract that is written entirely in capital letters, which reads as follows:

SECTION 12.0 *WAIVER OF JURY TRIAL.* LENDER AND BORROWER ACKNOWLEDGE AND AGREE THAT THERE MAY BE A CONSTITUTIONAL RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY CLAIM, DISPUTE OR LAWSUIT ARISING BETWEEN THEM, BUT THAT SUCH RIGHT MAY BE WAIVED. ACCORDINGLY, THE PARTIES AGREE:

(A) NOTWITHSTANDING SUCH CONSTITUTIONAL RIGHT, IN THIS COMMERCIAL MATTER THE PARTIES BELIEVE AND AGREE THAT IT SHALL BE IN THEIR BEST INTEREST TO WAIVE SUCH RIGHT AND, ACCORDINGLY, HEREBY WAIVE SUCH RIGHT TO A JURY TRIAL AND FURTHER AGREE THAT THE BEST FORUM FOR HEARING ANY CLAIM, DISPUTE OR LAWSUIT, IF ANY, ARISING IN CONNECTION WITH THIS AGREEMENT OR RELATIONSHIP BETWEEN LENDER AND BORROWER, INCLUDING, BUT NOT LIMITED TO, IN CONNECTION WITH THE COLLECTION OF THE LOAN OR OTHER OBLIGATIONS, SHALL BE A COURT OF COMPETENT JURIS-

DICTION SITTING WITHOUT A JURY;

(B) THIS WAIVER OF JURY TRIAL IS FREELY, KNOWINGLY AND VOLUNTARILY GIVEN BY EACH PARTY, WITHOUT ANY DURESS OR COERCION, AFTER EACH PARTY HAS CONSULTED WITH ITS COUNSEL AND HAS CAREFULLY AND COMPLETELY READ ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, SPECIFICALLY INCLUDING THIS WAIVER OF JURY TRIAL PROVISION ...

*CFC's Motion to Strike Jury Demand,* Exhibit A.

Walter Stubbs signed at least two other contracts containing identical provisions on the same date, including the "Guarantor Security Agreement," the "Security Agreement and Master Creditor Agreement," *CFC's Motion to Strike Jury Demand,* Exhibits B and C. In addition, on July 12, 1996, Walter Stubbs signed two documents entitled "Security Agreement and Capital Loan Agreement," which contained the same clause. In each case, with the exception of the Security Agreement and Master Creditor Agreement, which is printed entirely in a regular typeface, the clause is located immediately before the signature block and is the only clause in the document printed entirely in capital letters. Defendant CFC has now moved for this court to enforce the waiver clauses and strike the plaintiffs' demand for a jury trial as to the claims against CFC.

**A. The Seventh Amendment Right to a Jury May be Waived Via Contract**

The Seventh Amendment preserves a right to a jury trial on issues of fact in suits for breach of contract damages between private party litigants. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The Supreme Court, however, has long recog-

nized that a private litigant may waive its right to a jury in civil cases. Waiver can be either express or implied. *Commodity Futures Trading Comm. v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986); *see also D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972) (contractual waiver of due process rights). Waiver requires only that the party waiving such right do so "voluntarily" and "knowingly" based on the facts of the case. *D.H. Overmyer,* 405 U.S. at 185–86, 92 S.Ct. at 782; *Brookhart v. Janis,* 384 U.S. 1, 4, 5, 86 S.Ct. 1245, 1246, 1247, 16 L.Ed.2d 314 (1966). The acceptance of contract provisions providing for dispute resolution in a forum where there is no entitlement to a jury trial may satisfy the "voluntary" and "knowing" standard. *See, e.g., Northwest Airlines, Inc. v. Air Line Pilots Ass'n Int'l,* 373 F.2d 136, 142 (8th Cir.) *cert. denied,* 389 U.S. 827, 88 S.Ct. 77, 19 L.Ed.2d 83 (1967). Agreements waiving the right to trial by jury are neither illegal nor contrary to public policy. *McCarthy v. Wynne,* 126 F.2d 620, 623 (10th Cir.), *cert. denied,* 317 U.S. 640, 63 S.Ct. 31, 87 L.Ed. 515 (1942); *see also Leasing Serv. Corp. v. Crane,* 804 F.2d 828, 832 (4th Cir.1986) (right to jury trial, although fundamental, may be knowingly and intentionally waived by contract); *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 755 (6th Cir.1985) (considering it "clear that the parties to a contract may by prior written agreement waive the right to jury trial"). Nevertheless, jury trial waivers are common in loan agreements and loan guarantees, and these are regularly enforced. *See, e.g., National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 667–8 (S.D.N.Y.1991), *aff'd sub nom. Yaeger v. National Westminster,* 962 F.2d 1 (2d Cir.1992); *Oei v. Citibank, N.A.,* 957 F.Supp. 492 (S.D.N.Y.1997); *Cooperative Finance Assoc. v. Garst,* 871 F.Supp. 1168, 1171 (N.D.Iowa 1995); *Connecticut Nat'l Bank v. Smith,* 826 F.Supp. 57, 59 (D.R.I. 1993); *Okura & Co. v. Careau Group,* 783 F.Supp. 482, 488 (C.D.Cal.1991); *In re*

*Reggie Packing Co.,* 671 F.Supp. 571, 574 (N.D.Ill.1987).

The Fifth Circuit has not determined whether the movant or the opposing party bears the burden of proving a contractual waiver of the right to a jury trial. Other circuits are split on this question. Compare *Leasing Serv. Corp.,* 804 F.2d at 833 (4th Cir.1986) (burden is on party seeking enforcement of waiver provision) and *National Equipment Rental, Ltd. v. Hendrix,* 565 F.2d 255, 258 (2d Cir.1977) (same) with *K.M.C. Co.,* 757 F.2d at 755 (6th Cir.1985) (burden is on party seeking invalidation of waiver provision). Because the court finds clear contractual waiver in this case, it need not determine whether the burden is on plaintiffs or defendants.

## B. Plaintiffs' Claims Against CFC "Arise in Connection with the Agreement or Relationship" with CFC.

Plaintiffs first argue that the clauses do not apply to their claims against CFC because their claims do not arise "directly" out of the agreements containing the jury waiver provisions but instead are based on statutory violations and tort. Plaintiffs cannot deny, however, that they would have no claims against CFC at all but for the lending-borrowing relationship entered into by the parties pursuant to the contracts. *Phoenix Leasing, Inc. v. Sure Broadcasting Inc.,* 843 F.Supp. 1379, 1389–90 (D.Nev.1994) (claim for breach of duty of good faith implied under contract is made "with respect to" the contracts). Here, the language in the contracts does not limit the waiver of jury trial to actions arising directly from the terms of the agreements but instead to actions "arising in connection with this agreement or relationship between lender and borrower." Plaintiffs' causes of action clearly arise in connection with the lending agreements and out of the relationship between CFC and Westside. Accordingly, the court finds that the waiver of jury trial provi-

sions apply to the claims brought by plaintiffs against CFC.

## C. Plaintiffs Knowingly and Voluntarily Waived their Right to Jury Trial

▮ Plaintiffs next argue that even if the clauses do apply to their claims, they cannot be enforced because the waiver was not made "knowingly and voluntarily." In determining whether a waiver was made "knowingly and voluntarily," courts consider several factors:

(1) whether the contract was negotiable, (2) the conspicuousness of the provision, (3) the relative bargaining power of the parties, (4) whether the waiving party was represented by counsel, and (5) the business acumen of the party opposing the waiver. *See Whirlpool Financial Corp. v. Sevaux,* 866 F.Supp. 1102, 1105 (N.D.Ill.1994); *Morgan Guaranty Trust Co. of New York v. Crane,* 36 F.Supp.2d 602, 604 (S.D.N.Y.1999).

The court will consider each factor in turn.

### 1. Negotiability of Contract.

Although the terms of the contracts were not negotiated, there is no indication that the terms were not negotiable. Simply because the Stubbses did not attempt to negotiate the provisions does not mean that, in fact, the waiver or other terms in the contracts were not negotiable. *See Morgan Guaranty Trust Co.,* 36 F.Supp.2d at 604. Plaintiffs point to the fact that their negotiation of another contract with CFC resulted in "numerous telephone calls to CFC management, just to get approval for a solitary change." *Plaintiffs' Opposition* at 5, n 1. The fact that negotiation might have been unwieldy or inconvenient, however, does not mean that the contract was non-negotiable; if anything, it indicates that the Stubbses did successfully negotiate terms in contracts with CFC. The first factor, then, cuts in favor of finding "knowing and voluntary" waiver.

## 2. Location and Lettering of Clause.

An important factor is whether the waiver clause was set forth in bold and conspicuous lettering, or whether instead it was buried deep in the contract. *National Equipment Rental*, 565 F.2d at 258. In determining whether the clause is adequately conspicuous, courts consider the contracts on a case by case basis. *See, e.g., Leasing Serv. Corp.*, 804 F.2d at 833 (although jury waiver provision was in fine print in the middle of a thirtyeight line paragraph on reverse side of standardized document, in upholding district court's finding of waiver, court was influenced by fact that contract was only two pages long); *National Westminster Bank*, 130 B.R. at 667 (in determining that consent to jury waiver provision was knowing and voluntary, court noted that provision was only two inches above the signature and, like the balance of the guaranty, was printed in small but entirely legible text); *In re Reggie Packing Co.*, 671 F.Supp. at 573 (in enforcing jury waiver clause, court highlighted fact that contract was only three pages long, the waiver appeared just two inches above parties' signatures, and clause was in same type of print as all other contract terms).

Here, the relevant clauses were clearly written, in most instances in block print, just above the signature line. Even if the plaintiffs or their counsel declined to read the contract in its entirety, all the plaintiffs had to do to recognize that they were waiving their right to a jury was to skim the paragraphs immediately above their signatures. The block print ensured that even a cursory glance at the documents would indicate that the section concerning the jury trial waiver was the most important section in the document. The second factor clearly favors finding a waiver of plaintiffs' right to a jury trial.

## 3. Sophistication of Parties.

Another factor is whether the parties are sophisticated enough to have comprehended the import of the language contained in the waiver clause. *Leasing Serv. Corp.*, 804 F.2d at 833; *Telum v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837 (10th Cir.1988). Here, defendants have presented no evidence that Walter Stubbs had any notions about the significance of waiving a jury trial, and, indeed, Walter Stubbs has stated that he did not understand the contract then, and does not understand it now. The Stubbses were, however, experienced businesspeople who had entered into contracts before and can be presumed to understand the importance of reading contracts before signing them. Accordingly, the court finds that this factor works neither for nor against enforcement of the waiver clause.

## 4. Representation by Counsel.

A fourth factor is whether or not the parties were represented by counsel at the time of contracting. *Whirlpool Financial Corp.* 866 F.Supp. at 1105 (N.D.Ill.1994). Plaintiffs were represented by Edwin Stoutz during the time in which they signed the contracts in question. Stoutz could have reviewed the papers if he so wished. In cases where a party is represented by counsel but the attorney chooses not to review a contract, courts have held that the "representation" factor is satisfied and upheld waiver of the right to a jury trial. *See Bonfield v. AAMCO Transmissions, Inc.*, 717 F.Supp. 589, 595–6 (N.D.Ill.1989). The court therefore finds that the Stubbses were represented at the time that they signed the contracts. Because it appears that no lawyer actually read the contracts, however, the court does not find this factor as probative as the others in determining that waiver occurred.

## 5. Unequal Bargaining Power.

Finally, courts consider whether there is a gross inequality in bargaining power between the parties. *See Leasing Service Corp.*, 804 F.2d at 833; *Luis Acosta v. Citibank*, 920 F.Supp. 15, 18 (D.P.R.1996). Here, plaintiffs assert that they were in

effect forced to sign the contracts because they had no other means of acquiring the necessary funding to secure the Laplace dealership. It is clear to the court that there was some inequality of bargaining power present in the transactions in question. To invalidate a waiver provision, however, the bargaining differential must be the kind of "extreme bargaining disadvantage" or "gross disparity in bargaining position" that occurs only in certain exceptional situations. For example, in one case the defendant claimed that the plaintiff had a near monopoly within the field of start up loans for fledgling cable companies. *Phoenix Leasing, Inc.*, 843 F.Supp. at 1379, 1385 (D.Nev.1994). The court held that, assuming that plaintiffs' averment was true, it did not indicate the kind of unequal power relationship necessarily leading to a finding of inequality of bargaining power. *Id.* In response to the defendant's argument that "necessitous men are not free men," the court stated:

> Defendant was not in the position of necessitous men. The ability to take out a loan to start up a profit making cable company is not a necessity of life such that Defendant was compelled to accept Plaintiff's loan on whatever terms it was offered. The evidence before us does not indicate Defendant was in any difficulty or under some form of duress. Defendant/Counterclaimant Sure Broadcasting could have simply declined the offered terms. Nothing compelled Defendant to accept the loan on these terms, they were perfectly free to reject the deal. "This is not the kind of case that supports a 'necessitous men are not free men' approach. Nothing here calls on a court to rescue Defendant from a contract (or a contract term) entered into knowingly and voluntarily."
> *Phoenix Leasing, Inc. v. Sure Broadcasting Inc.*, 843 F.Supp. at 1385 (D.Nev.1994) (citations omitted).[1]

Here, plaintiffs clearly felt considerable pressure to obtain financing for the Laplace dealership. But they have produced no evidence that they could not have gone elsewhere for financing had they found CFC's terms oppressive. In fact, Walter Stubbs testified that he managed to get CFC to decrease its interest rate by obtaining a competitive offer for financing from Hibernia Bank. *Deposition of W. Stubbs* at 564. CFC in no way deprived Stubbs of his freedom in presenting him with the loan agreements.

In light of the numerous factors it has considered, the court finds that plaintiffs "knowingly and voluntarily" waived their right to a jury trial on their claims against CFC. The court notes that this holding in no way implicates plaintiffs' right to a jury trial against other defendants on other claims.

## III. PLAINTIFFS' MOTION FOR REVIEW OF MAGISTRATE'S ORDER OF 5–5–99

The district court's standard of review in considering a magistrate judge's ruling on a nondispositive motion, as here, is set out in Rule 72(a) of the Federal Rules:

> Nondispositive Matters. A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made. The district judge to whom the case is assigned shall

---

1. Similarly, courts have enforced waiver clauses even where a franchisor stated that it would not accept changes in its contract, *Bonfield*, 717 F.Supp. at 596, and where the contracts in question were "take it or leave it," *Seaboard Lumber Co. v. U.S.*, 903 F.2d 1560, 1564, 58 USLW 2748 (Fed.Cir.1990)

consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.

Fed.R.Civ.P. 72(a).

Thus, the court applies a "clearly erroneous" standard to Judge Shushan's Order.

■ With respect to Judge Shushan's decision to deny plaintiffs' leave to add a RICO claim, the court finds no clear error. Judge Shushan held that plaintiffs were not entitled to amend their complaint in this manner because they knew before the amendment deadline that they planned to file a RICO complaint, and told Magistrate Judge Wilkinson so in a conference, they were privy to the facts underlying such a claim, and they waited until nine months after the deadline to file their claim. Judge Shushan's opinion is not clearly erroneous, and the court declines to overrule it.

Plaintiffs argue that Judge Shushan's ruling was based solely on the prejudice that would be suffered by defendants due to the approaching trial date, and that because this case has been reallotted to a different section, the trial date and the resultant prejudice to defendants is no longer at issue. The court disagrees. Trial of this case has been reset for January 2000. Requiring the defendants to defend a RICO claim with only six months until trial would be unduly burdensome, especially given plaintiffs' dilatory behavior in failing to amend their complaint until nine months after the deadline. In addition, plaintiffs' assertion that the trial date was Judge Shushan's *sole* reason for denying leave is disingenuous. The impending trial date was one factor of many recited by Judge Shushan in her decision to deny leave to amend, and even with a slightly later trial date, the other factors remain the same. While Judge Shushan did not rely on her suspicion about the futility of the RICO claim in her decision to deny plaintiffs the opportunity to pursue it, the court finds her suspicion telling. Adjudication of this case has already been exces-

sively delayed. Accordingly, the court declines to overrule Magistrate Shushan's decision to deny leave to amend the complaint to add a RICO claim.

Judge Shushan's Order did not clearly address the issue of the non-RICO claims. However, the court finds that, under the notice pleading standard established by the federal rules, no amendment is necessary. Plaintiff Walter Stubbs has clearly pled an individual claim under the ADD-CA. Any facts uncovered in discovery (e.g., information regarding what facts Chrysler allegedly represented to the subsequent owners of the Laplace dealership) are further evidence of the claims already made by plaintiffs, but do not constitute new claims, and do not need to be plead. Accordingly, the court denies plaintiffs' Motion for Review of Magistrate's Order of 5–5–99.

## IV. PLAINTIFFS' MOTION FOR REVIEW OF MAGISTRATE'S ORDER OF 6–4–99

Plaintiffs also seek review of another of Judge Shushan's Orders, this one dated June 3, 1999, and entered into the record on June 4, 1999. In that Order, Judge Shushan granted Chrysler a protective order on two particular areas of inquiry: Item 8A, which concerns Chrysler's change in the "Planning Potential" for the successor dealership Laplace dealership after the Stubbses were forced to go out of business, and Item 8C, which concerns the operating forecasts presented by Chrysler to the successor purchasers regarding the Laplace location. Plaintiffs allege that access to this information would afford them the opportunity to show that Chrysler knew when it urged the Stubbses to move to Laplace that Laplace was not the booming market Chrysler claimed, and that Chrysler intentionally misled the Stubbses. Magistrate Shushan's Order gives no reason for denying plaintiffs access to 8A and 8C. In their Response to the Motion to Review, Chrysler has offered to allow plaintiffs to depose Chrysler's 30(b)(6) wit-

ness regarding Items 8A and 8C, thereby mooting the issue of Magistrate Shushan's Order. Counsel for plaintiffs have confirmed that the issue is moot. Accordingly, the court denies the Motion to Review Magistrate Order of 6–4–99 as moot.

## V. MOTIONS TO VACATE CONSOLIDATION

Both DaimlerChrysler and CFC have filed motions asking the court to reverse its June 14, 1999 Order consolidating this case with the case of *DaimlerChrysler Corp. v. Alfred S. Stevens, Jr.*, C.A. 99–1200. In that case, DaimlerChrysler brought suit against Al Stevens, a former Chrysler employee. The suit is related to the Westside–Marrero litigation in that Al Stevens is named in plaintiffs' complaint as the Chrysler employee who bribed and extorted the Stubbses, and named in Chrysler's counterclaim as the employee with whom Stubbs conspired to breach Stevens' fiduciary duties to Chrysler. The Chrysler versus Stevens suit arises out of the very same situation as does Chrysler's counterclaim, but alleges that, in addition to Stubbs, Stevens is liable.

Chrysler also alleges in its suit against Stevens additional breaches of Stevens' fiduciary duties to Chrysler, breach of his employment contract, and fraud based on allegations of his disclosure of highly sensitive, confidential financial information to Westside and his submission to Chrysler of fraudulent expense reports.

The Stevens case was filed in April 1999, when the litigation filed by Westside–Marrero, et al., had been pending for almost two years. Stevens filed his Answer on June 25, 1999 and asserted a counterclaim against Chrysler for unlawful retaliation against a former employee under the Fair Labor Standards Act, abuse of process, and breach of its employment obligations to Stevens.

■ The court has broad discretion under the federal rules to order consolidation where it finds that common questions of law and fact exist and that consolidation would avoid unnecessary delay. Fed. R.Civ.P. 42(a). The court declines to deconsolidate these cases for several reasons. Here, it is uncontested that there are many common issues of law and fact and some issues distinct to each case. While the Stevens case was filed much more recently than the Westside case, the Stevens case is much less extensive in scope, and Stevens' counsel represented to the court at oral argument that she could be prepared for trial by the January 2000 trial date set in the Westside matter. It was clearly within this court's discretion to order that these cases be consolidated.

Moreover, trying these cases separately could prove unfairly prejudicial to all the parties involved. While Chrysler and CFC are unconcerned by the possibility that any of the plaintiffs might use offensive collateral estoppel against them, Stevens and the Westside plaintiffs both worry about the ramifications of one of the cases proceeding to trial before the other where the Westside plaintiffs and the Stevens defendant are witnesses in each other's cases. Could Stevens, for example, be bound in his trial by his testimony in the Westside trial should that case be tried first? It is unnecessary for the court to consider whether Stevens is in privity with any of the parties in the Westside case (and, therefore, that Stevens could collaterally estopped from making conflicting arguments in the two cases), and the court therefore declines to issue a ruling on whether collateral estoppel could be used. Even if collateral estoppel could not be used against Stevens or Stubbs, trying the cases separately could create a minefield of problems. The potential unfair prejudice against certain parties, especially, Stevens is substantial. There is also a risk of inconsistent judgments, even if collateral estoppel is not invoked. For example, in order for Chrysler to prove its counterclaims against Stubbs, it must effectively argue that Stevens breached a fiduciary duty to Chrysler and that Stubbs was a co-

conspirator or a joint tort-feasor in that breach. If the jury in the Westside case finds that Stevens did indeed breach a duty and that Stubbs was a co-conspirator, but the jury in the Stevens litigation does not find that Stevens breached a duty, the court will be faced with the very unpleasant reality of two conflicting judgments, and uncertainty regarding their execution.

Chrysler, on the other hand, will not be unfairly prejudiced in trying these two cases together. Chrysler has chosen to bring suit against Stevens. Plaintiffs make a thought-provoking argument that Stevens is in fact a necessary party to this litigation, given Chrysler's counterclaim against Stubbs. The court is unpersuaded by Chrysler's argument that Chrysler necessarily must take conflicting positions in each case regarding the issues surrounding Stevens. This court is in the business of seeking the truth. Each party must present the facts of its case as it believes they truly happened. Chrysler must make a choice about what it plans to argue at trial and be consistent about its allegations. Accordingly,

**IT IS ORDERED** that the Motion for Reconsideration filed by plaintiffs (Doc. # 341) is hereby **GRANTED** in part and **DENIED** in part: the court hereby withdraws its previous ruling dismissing Walter Stubbs's individual claims under the ADDCA, but the court makes no other changes in its previous rulings of 3–9–99 and 3–26–99;

**IT IS FURTHER ORDERED** that the Motion to Dismiss filed by defendant CFC (Doc. # 309) is hereby **GRANTED** in part and **DENIED** in part: all the courts previous rulings of 3–26–99 are hereby extended to defendant CFC with the exception of the ruling regarding Walter Stubbs's individual ADDCA claims, as that ruling has been rescinded;

**IT IS FURTHER ORDERED** that the Motion to Strike Jury Demand (Doc. # 313) is hereby **GRANTED**; the portions of the trial concerning defendant CFC shall be adjudicated by the court, but this ruling shall have no effect on plaintiffs' right to a jury trial vis-à-vis the other defendants;

**IT IS FURTHER ORDERED** that the Motion to Review Magistrate's Order of 5–5–99 (Doc. # 367) is hereby **DENIED;**

**IT IS FURTHER ORDERED** that the Motion to Review Magistrate's Order of 6–4–99 (Doc. # 400) is hereby **DENIED** as **MOOT;** and

**IT IS ORDERED** that the Motion to Vacate Order Consolidating Cases (Doc. # 405); and Motion to Vacate Order Consolidating Civil Action Nos. 97–3012 and 99–1200 (Doc. # 404) are hereby **DENIED.**